# Illinois Official Reports

## Appellate Court

---

### *People v. Walker*, 2021 IL App (4th) 190073

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL R. WALKER, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-19-0073 |
| Filed<br>Rehearing denied | August 10, 2021<br>September 2, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 15-CF-1062; the Hon. John W. Belz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Michael Gomez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel            JUSTICE DeARMOND delivered the judgment of the court, with opinion.

Presiding Justice Knecht and Justice Steigmann concurred in the judgment and opinion.

## OPINION

¶ 1       In October 2015, defendant, Michael R. Walker, was charged by information with multiple counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Counts I, II, and III charged predatory criminal sexual assault under section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2014)) as nonprobationable Class X felonies, punishable by 6 to 60 years' incarceration (720 ILCS 5/11-1.40(b)(1) (West 2014)). These three counts fell under mandatory consecutive sentencing guidelines. 730 ILCS 5/5-8-4(d)(2) (West 2014). Counts IV and V alleged aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2) (West 2014)), Class 2 felonies with potential penalties ranging from probation to three to seven years' incarceration (720 ILCS 5/11-1.60(g) (West 2014)). All five counts alleged the crimes took place from May 2015 to July 2015 and involved the same victim, S.W., who was seven years old at the time of the alleged incidents. The State dismissed count II before the close of evidence.

¶ 2       After a two-day trial in May 2018, the jury found defendant guilty on all counts (I, III, IV, and V). The trial court sentenced defendant to 15 years in the Illinois Department of Corrections on count I to run consecutively to his 15-year sentence on count III. Additionally, the court sentenced defendant to five years' imprisonment on counts IV and V. Defendant's motion to reconsider the sentence was denied, and defendant appeals.

¶ 3                                       I. BACKGROUND

¶ 4       In October 2015, defendant was charged with three counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse arising from allegations he abused and assaulted S.W., his seven-year-old niece. Defendant's jury trial commenced in May 2018. The State called two law enforcement officers who responded to the scene and investigated the allegations. Dr. Careyana Brenham testified as an expert in child abuse investigations. She described her education, experience, and training in conducting child sexual assault examinations and the procedure involved in conducting such examinations. Dr. Brenham's examination of S.W. occurred shortly after S.W. disclosed the allegations to her mother while vacationing in Wisconsin. Dr. Brenham said S.W. told her defendant touched her in the genital area and pointed to the corresponding area on a female anatomical chart. S.W. told Dr. Brenham defendant touched her there approximately "30 times," including digital penetration, and at times this caused her pain. S.W. also said defendant "licked her" and "bit her" in the genital area approximately 25 times. She said all but one of the assaults happened in defendant's bedroom. Although Dr. Brenham did not see any bruising or tearing in the vaginal area at the time of her examination, she said that was not unusual, considering S.W. reported defendant last abused her over a month prior to the exam.

¶ 5       S.W.'s father testified that, during the time the sexual assaults were taking place, defendant lived with their father in one farmhouse while S.W.'s father lived in another farmhouse

approximately 150 yards away. When S.W. came to visit her father, she would often play outside or spend a significant amount of time playing video games or watching movies in defendant's bedroom. S.W.'s father said the extensive interaction between S.W. and defendant made him feel uncomfortable because defendant would spend more time with S.W. than with him. He testified about receiving the phone call from S.W.'s mother in July 2015, the substance of which was to inform him of the recent disclosure S.W. made to her while S.W. and her mother vacationed in Wisconsin. S.W.'s mother said S.W. told her defendant repeatedly sexually assaulted her in his bedroom while she visited the farm in the summer of 2015. After receiving the call, S.W.'s father said he relayed this information to his father and they both confronted defendant about the accusation. S.W.'s father asked defendant to either admit or deny the accusation, and if true, they would attempt to get him some form of treatment. Defendant responded "yes." S.W.'s father contacted the police two days later and made a report.

¶ 6          During S.W.'s mother's testimony, she provided more detail about the statement S.W. made to her during the Wisconsin trip. She said, while they were getting cleaned up after swimming, S.W. told her that "[defendant] has been touching my vagina." S.W. also told her about the last time the abuse occurred, saying defendant put his mouth on S.W.'s vagina, biting it, and forced her to touch his penis.

¶ 7          S.W. was 10 years old at the time of the trial. She testified that, when she was seven or eight years old and visited the farmhouse during the summer of 2015, she would enter defendant's bedroom to play video games or watch movies. Defendant would shut the door "[t]o make sure no one else saw what we were doing." While lying on the bed, she would pull down her pants and defendant would touch the inside of her vagina or put his mouth on it, occasionally biting her vagina. She said these things made her feel "weird and uncomfortable." S.W. testified she knew what was going to happen in defendant's bedroom because it had happened before. She "knew it was wrong" but "didn't want to tell anybody because [she] thought [she] was going to get in trouble." She described being gone for six months while her family lived in Ireland and that, upon her return, the sexual abuse began again. S.W. said she asked defendant if it could stop. Defendant would "put on a sad face." S.W. allowed the sexual assaults to continue because "I didn't want to have that guilt on me of making somebody sad." She described how defendant would touch her vagina with his hand or mouth and, when with his hand, "he would open up the outside of it and touch the inside." S.W. said she had also seen defendant's penis "accidentally" and touched it when he told her to. S.W. said when they were at her "grandpa's cabin in Wisconsin," she told her mother about defendant putting his mouth on her vagina. She said she was able to tell her mother when they were in Wisconsin because she believed "no one could get [her] there." She also said she had waited to tell because she "thought it was [her] fault." The defense had no cross-examination.

¶ 8          The parties then stipulated to S.W.'s video recorded interview at the Child Advocacy Center (CAC), which was published to the jury. Lindsey Reichert, a forensic interviewer with the CAC in Sangamon County and the person who interviewed S.W., testified about the interview and identified her interview notes and the demonstrative male and female anatomical drawings used during the interview, which were admitted into evidence. At the close of the State's case, defendant elected not to testify or present any other evidence. After the two-day trial, the jury found defendant guilty on all counts. The matter was referred to court services for a presentence investigation report and set for sentencing in November 2018. Defendant,

who at this stage of the proceedings had been through three attorneys and had filed one of several motions for substitution of judge for cause, filed a series of *pro se* posttrial motions. Defendant sought transcripts of all court appearances and transcriptions of audio-recorded interviews, a "Motion for New Trial and *Krankel* Hearing with Leave to Amend," a "*Praecipe*" directed at the circuit clerk to send him copies of all his motions, and a "Motion to Proceed *Pro Se*." During this same time, defendant's retained counsel filed a motion for a new trial.

¶ 9      By the time of the hearing on the posttrial motions and sentencing, defendant maintained he was no longer represented by counsel. After failing to persuade the trial court there was evidence of counsel's ineffectiveness during a preliminary *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)), defendant reiterated his desire to represent himself. The trial court provided Illinois Supreme Court Rule 401 (eff. July 1, 1984) admonishments, and defendant elected to proceed as his own counsel. The sentencing hearing was continued to give him sufficient time to file his own motion for a new trial. After protracted litigation addressing additional motions for substitution of judge and an effort to file a notice of appeal, the matter then proceeded to a hearing on defendant's posttrial motion and sentencing in March 2019. Before proceeding to sentencing, the trial court denied defendant's motion for a new trial. The court then heard arguments from the parties and victim impact statements from S.W.'s family members. Defendant presented no evidence in mitigation. The trial court sentenced defendant to consecutive sentences of 15 years on each predatory criminal sexual assault count and concurrent sentences of 5 years on each criminal sexual abuse count.

¶ 10     Defendant's *pro se* motion seeking to reconsider his sentence argued (1) the trial court lacked jurisdiction at the time of sentencing and therefore defendant was "illegally sentenced," (2) the trial court did not properly consider statutory factors in mitigation before sentencing defendant, and (3) the trial court improperly considered factors in aggravation. At the hearing on his motion, defendant requested and received appointed counsel to assist him with his posttrial motions. In January 2019, appointed counsel filed a "Motion to Reconsider Sentence," incorporating portions of defendant's *pro se* motions as well. Counsel argued the trial court failed to give proper weight to certain factors in mitigation, the court improperly considered defendant's position of trust over S.W. as an aggravating factor, and the sentence was excessive. The trial court denied defendant's motion.

¶ 11     This appeal followed.

¶ 12                                    II. ANALYSIS

¶ 13     Defendant asserts three claims of error: (1) the trial court erred by allowing inadmissible testimony from S.W.'s father and Detective Michael Harth of the Sangamon County Sheriff's Office; (2) the trial court failed to give proper Rule 431(b) admonishments to prospective jurors (see Ill. S. Ct. R. 431(b) (eff. July 1, 2012)); and (3) defendant's sentence is excessive because the trial court placed too much emphasis on deterrence, failed to consider defendant's potential for rehabilitation, and appeared to "punish" defendant for exercising his right to go to trial. Defendant acknowledges he did not properly raise the first two issues before the trial court but asks us to consider them as plain error.

- 4 -

¶ 14                                        A. Relevant Evidence Under
                                  Illinois Rule of Evidence 401 (eff. Jan. 1, 2011)

¶ 15                                              1. *Plain Error*

¶ 16         First, defendant claims S.W.'s father's testimony about his suspicions regarding the nature
        of the relationship between defendant and S.W., his daughter, was irrelevant and unduly
        prejudicial. Because there was no objection to S.W.'s father's testimony during trial, defendant
        argues we should consider this issue under the plain-error doctrine. Alternatively, defendant
        argues defense counsel's failure to object to this testimony constitutes ineffective assistance of
        counsel.

¶ 17         Reviewing courts may, in the exercise of their discretion, excuse a defendant's procedural
        default under either one of two instances:

               "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced
               that the error alone threatened to tip the scales of justice against the defendant,
               regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred
               and that error is so serious that it affected the fairness of the defendant's trial and
               challenged the integrity of the judicial process, regardless of the closeness of the
               evidence.' " *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 (quoting *People v.
               Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007), citing *People v.
               Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479-80 (2005)).

        The burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495,
        922 N.E.2d 344, 355 (2009). The first step under either prong is to determine "whether there
        was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49.

¶ 18         "Relevance is a threshold requirement that must be met by every item of evidence. 'All
        relevant evidence is admissible, except as otherwise provided by law. Evidence which is not
        relevant is not admissible.' " *People v. Dabbs*, 239 Ill. 2d 277, 289, 940 N.E.2d 1088, 1096
        (2010) (quoting Illinois Rule of Evidence 402 (eff. Jan. 1, 2011)). Under Illinois Rule of
        Evidence 401 (eff. Jan. 1, 2011), " 'Relevant evidence' means evidence having any tendency
        to make the existence of any fact that is of consequence to the determination of the action more
        probable or less probable than it would be without the evidence." To meet this standard, the
        evidence need not be conclusive. For example,

               "[M]ost convictions result from the cumulation of bits of proof which, taken singly,
               would not be enough in the mind of a fair minded person. All that is necessary, and *all
               that is possible*, is that each bit may have enough rational connection with the issue to
               be considered a factor contributing to an answer." (Emphasis in original and internal
               quotation marks omitted.) *People v. Prather*, 2012 IL App (2d) 111104, ¶ 22, 979
               N.E.2d 540.

¶ 19         "Although relevant, evidence may be excluded if its probative value is substantially
        outweighed by the danger of unfair prejudice ***." Ill. R. Evid. 403 (eff. Jan. 1. 2011). The
        exclusion or admission of evidence lies within the discretion of the trial court and will not be
        disturbed absent an abuse of discretion. *People v. Hope*, 168 Ill. 2d 1, 43, 658 N.E.2d 391, 410
        (1995).

¶ 20         Defendant claims S.W.'s father's testimony "about his suspicions, beliefs, and feelings
        about [defendant], and that those suspicions were vindicated by S.W.'s allegations, did not
        meet the threshold standard of relevance." Defendant takes issue with S.W.'s father's

                                                 - 5 -

testimony about the emotional impact of his telephone conversation with S.W.'s mother concerning his daughter's disclosure. Specifically, the prosecutor's question was:

"Q. How did the statement that [S.W.'s mother] make [*sic*] to you affect you emotionally?

A. I mean, it kinda made me sick. Like the suspicions that I had kind of all came together to where I was more just—I mean, I didn't want to be right. You know, I wanted to think that I was making it all up in my head, but once it like [S.W.'s mother] told me what [S.W.] did, it kinda like verified what I [had] been thinking the whole time but I had no evidence or proof of."

¶ 21    A complete review of the record reveals S.W.'s father's "suspicions" were based on what he previously *observed* taking place between defendant and S.W. S.W.'s father said he was uncomfortable with the amount of time S.W. spent with his brother—defendant—when S.W. came to visit. He found it concerning defendant spent so much time with his children. He testified S.W. would be constantly in and out of defendant's room, alone with defendant, purportedly playing video games, and that S.W.'s father would have to go in to tell her "to go back outside and play" because he was uncomfortable with the amount of time they spent in defendant's room. S.W.'s father described several instances where he walked in to see S.W. sitting on defendant's lap while they played video games or watched a movie together on the computer. On cross-examination, he said he consistently told his parents to keep defendant away from S.W. when she was visiting his father's farmhouse. When cross-examined on his lack of "proof," S.W.'s father responded, "I observed many things that made me very uncomfortable and that I probably should have spoke up at that moment *** I approached my parents many times telling them I was uncomfortable with [defendant] around [S.W.]" He acknowledged, in response to defense counsel's questioning, he never personally witnessed any sexual conduct between S.W. and defendant; however, S.W.'s father went on to describe an incident where he observed S.W. and defendant "playing" together on defendant's bed. S.W.'s father said when he walked in, defendant grabbed a pillow and placed it over his crotch area.

¶ 22    S.W.'s father's testimony regarding his state of mind when told about his daughter's disclosure, and his actions subsequent thereto, was relevant in setting up the circumstances under which S.W.'s father and grandfather confronted defendant about the allegations. Further, when coupled with the actual observations S.W.'s father made, his testimony regarding his "suspicions" helped explain how defendant, unfortunately, remained free to sexually molest S.W. over the period of time she described. Unlike "state of mind" hearsay evidence under Illinois Rule of Evidence 803 (eff. Apr. 26, 2012), here, the "declarant"—S.W.'s father—was present and available for cross-examination. He testified to his state of mind when he learned of the disclosure, the basis for his suspicions, and how it impacted his subsequent actions. This is evidence that tends to prove a fact in controversy or renders a matter at issue more probable. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Hence, the testimony was relevant.

¶ 23    Defendant next argues that, even if this testimony is relevant, it was unduly prejudicial and should have been excluded. Rule 403 states relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 24    Defendant calls S.W.'s father's statements "extremely prejudicial" because his testimony was based "on the feelings of a protective father." As discussed above, S.W.'s father's

testimony was not based on speculative feelings. He based his suspicions on specific observations made over the course of time. S.W.'s father's testimony may be considered prejudicial. See *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 120, 107 N.E.3d 938 (stating all evidence offered at trial is prejudicial). However, because his testimony related to his observations and explained what precipitated informing his father and confronting defendant about the need for "help," we find the probative value is not substantially outweighed by the danger of unfair prejudice, especially in light of defendant's subsequent admission. *People v. Balfour*, 2015 IL App (1st) 122325, ¶ 44, 30 N.E.3d 1141.

¶ 25     Therefore, because S.W.'s father's testimony was relevant and probative, we find there was no clear and obvious error in its admission and see no need to proceed further under either prong of plain-error analysis. *People v. Hood*, 2016 IL 118581, ¶ 18, 67 N.E.3d 213 (finding that absent error, there can be no plain error).

¶ 26                            *2. Ineffective Assistance of Counsel*

¶ 27     Defendant next claims trial counsel was ineffective for failing to object to such evidence. We disagree.

¶ 28     A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). "Deficient performance" means "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). "Prejudice" in the context of an ineffective assistance of counsel claim requires a showing of a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Peeples*, 205 Ill. 2d 480, 513, 793 N.E.2d 641, 662 (2002) (quoting *Strickland*, 466 U.S. at 694).

¶ 29     A defendant must satisfy both prongs of *Strickland*, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010). "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009).

¶ 30     As previously discussed, S.W.'s father's testimony was relevant under Rule 401 and was not substantially outweighed by the danger of unfair prejudice under Rule 403. There was no error in counsel's failure to object, and thus, counsel cannot be found deficient for failing to object to relevant admissible testimony. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285 (holding defense counsel will not be found ineffective for failing to assert a meritless objection); see also *People v. Williams*, 147 Ill. 2d 173, 238-39, 588 N.E.2d

983, 1009 (1991) ("[D]efense counsel is not required to undertake fruitless efforts to demonstrate his effectiveness."). Defendant has therefore failed to satisfy the deficient performance prong, a failure that is fatal to any ineffective-assistance-of-counsel claim. *Clendenin*, 238 Ill. 2d at 317-18 (holding that, because a defendant must satisfy both prongs of *Strickland*, the failure to establish either is fatal to the claim).

¶ 31                          B. Lay Opinion Testimony

¶ 32    Defendant also contends S.W.'s father's statements constituted improper lay opinion testimony. Again, defendant seeks to avoid his procedural forfeiture by claiming plain error or, alternatively, ineffective assistance of counsel.

¶ 33    Illinois's rules of evidence allow opinion testimony from lay witnesses with some limitations.

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or *inferences* is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge ***." (Emphasis added.) Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 34    Lay opinion testimony is admissible when a lay witness would have difficulty explaining the facts upon which the opinion or inference is based, or where the opinion is of a condition that the witness could not easily describe. *People v. Owens*, 372 Ill. App. 3d 616, 622, 874 N.E.2d 116, 120 (2007). All lay opinion testimony must be relevant to be admissible. *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574, 771 N.E.2d 445, 455-56 (2002).

¶ 35    To support his argument, defendant relies on a line of cases in which lay witness opinion testimony was deemed improper because the testimony went to the "ultimate question of fact" to be decided by the jury. See *People v. McClellan*, 216 Ill. App. 3d 1007, 1013-14, 576 N.E.2d 481, 486 (1991); *People v. Brown*, 200 Ill. App. 3d 566, 578-80, 558 N.E.2d 309, 316-17 (1990); *People v. Crump*, 319 Ill. App. 3d 538, 542-43, 745 N.E.2d 692, 696-97 (2001). However, in our 2007 *Owens* decision, we pointed out "decisions rendered by the Supreme Court of Illinois since *McClellan* make clear that [the ultimate question of fact objection] is no longer good law." *Owens*, 372 Ill. App. 3d at 620. In *Owens*, we referenced the supreme court's holdings in *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 658 N.E.2d 371 (1995), and *People v. Terrell*, 185 Ill. 2d 467, 708 N.E.2d 309 (1998), finding it to be "well settled" that expert or lay witness opinions on an ultimate fact or issue were admissible. *Owens*, 372 Ill. App. 3d at 621. In addition, we noted several cases in which this court has done likewise. See *People v. Raines*, 354 Ill. App. 3d 209, 220, 820 N.E.2d 592, 601 (2004); *People v. Reatherford*, 345 Ill. App. 3d 327, 341, 802 N.E.2d 340, 353 (2003). Defendant cites no post-*Owens* case to support his claim that S.W.'s father's testimony was improper lay witness testimony. We elect to follow our holding in *Owens*, a case that has been cited over a dozen times with approval.

¶ 36    More importantly, under Rule 701, S.W.'s father's testimony was proper because it was rationally based on his perceptions, *i.e.*, his "suspicions" as a result of conduct and interactions he observed between defendant and S.W. He was subject to cross-examination, and the jury was free to determine how much weight to give his testimony in light thereof. He explained how reluctant he was to believe what he had suspected and how he needed confirmation from S.W.'s mother regarding the disclosure before he was able to confront his brother. Even after

telling his father, it was necessary to call S.W.'s mother again and allow him to hear the contents of S.W.'s disclosure before they confronted defendant. When taken in context, this evidence was helpful in providing a clear understanding of the facts and contributed to a determination of a fact in issue.

¶ 37     As proper lay witness testimony under Rule 701, there was no clear and obvious error in admitting the portion of S.W.'s father's testimony to which defendant objects. We therefore decline to consider this issue under either prong of plain-error analysis as well. *Hood*, 2016 IL 118581, ¶ 18. Again, because this testimony was properly admitted, trial counsel was not ineffective for failing to object. *Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 38                                C. Defendant's Statement

¶ 39     Defendant also claims testimony regarding his admission was "improper and prejudicial" because S.W.'s father failed to accurately recite defendant's hearsay statement, and it therefore constituted improper lay witness testimony.

¶ 40     More specifically, defendant starts from the faulty premise that S.W.'s father "failed to accurately recite [defendant's] statement, or more importantly, the question [defendant] allegedly answered when he said, 'Yes.' " Of course, the contents of the conversation were matters of fact for the jury to determine. Neither the jury nor this court are obligated to accept defendant's version. Additionally, as we will discuss below, several of the statements defendant contends were improper lay opinion testimony were either not opinions or were legitimate responses to questioning by defense counsel on cross-examination. Defendant seeks support from several cases where witnesses testified to the meaning of ambiguous phrases. See *People v. McCarter*, 385 Ill. App. 3d 919, 934, 897 N.E.2d 265, 279 (2008); *Brown*, 200 Ill. App. 3d at 578-79; *People v. Linkogle*, 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075, 1078 (1977). In each instance, the witness was asked to explain or interpret what another witness meant by a particular use of terms, the meanings of which may not have been readily apparent otherwise.

¶ 41     Unlike *McCarter*, *Brown*, or *Linkogle*, S.W.'s father was not asked to interpret the meaning of any word or words used by defendant. Instead, the question put to him was, when he asked defendant to "[a]dmit it and we'll try to find you help, yes or no," was there "any question in your mind that you were asking him to admit that he had had sexual conduct or contact with [S.W.]?" This is not improper opinion testimony but instead a statement admissible under Illinois Rule of Evidence 803(3)(B) (eff. Apr. 26, 2012), the "state of mind" exception. S.W.'s father's explanation of what he intended was a hearsay statement expressing the declarant's—his—state of mind at the time of utterance, admissible even if S.W.'s father were unavailable to testify. Ill. R. Evid. 803(3)(B) (eff. Apr. 26, 2012).

¶ 42     Here, S.W.'s father was present and available for cross-examination on the stated question. Instead, counsel chose to ask a different question on cross-examination: "He never said, 'I did it,' did he?" Of course, counsel also fails to note that, immediately preceding that question, when asked what S.W.'s father told Deputy Fleck, he responded, "I said—I asked him, 'Admit to it if you did it and we'll try to find you help,' and I said, 'Did you do it,' and he said, 'Yes.' " This was essentially the same response S.W.'s father gave previously during direct examination when asked to relate the conversation he had with his father and defendant. None of these statements are opinions and therefore are not subject to analysis as lay opinion testimony. Instead, they are admissions of the defendant, admissible under Rule 801. On cross-examination, when asked if defendant specifically said the words, "I did it," S.W.'s father

responded, "it was the same—he might as well have, okay? He was admitting to it." This is the only lay opinion testimony and came in response to defense counsel's question on cross-examination.

¶ 43    *McCarter*, *Brown*, and *Linkogle* consisted of someone uttering ambiguous statements with more than one possible interpretation. Here, defendant's statement is a one-word, unambiguous response to whether S.W.'s allegations were true or not. There is nothing improper with S.W.'s father's later statement that defendant "was admitting to it" when considering the context in which it was presented on cross-examination. Further, S.W.'s father was allowed to provide his inference or opinion as to what defendant meant by his "yes" response, even if that may go to the ultimate issue in the case. A witness, "whether expert or lay, may provide an opinion on the ultimate issue in a case." *Terrell*, 185 Ill. 2d at 496. Illinois law allows such testimony because the trier of fact does not have to accept the witness's conclusion or opinion and therefore his or her opinion does not "usurp the province of the jury." *Richardson v. Chapman*, 175 Ill. 2d 98, 107, 676 N.E.2d 621, 625 (1997).

¶ 44    S.W.'s father's answer to defense counsel's question was his opinion, which is proper under Rule 701 and thus was not improper lay witness testimony. Additionally, trial counsel was not ineffective for failing to object to relevant admissible evidence. *Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 45                        D. Detective Harth's Testimony

¶ 46    Defendant argues it was either plain error or ineffective assistance of counsel to allow Detective Harth to testify about defendant's statement based on his review of Deputy Fleck's report. During direct examination, and without discussing the substance of the statement, Detective Harth testified the statement defendant made to S.W.'s father was important to his investigation of the case because it was an admission to the alleged offenses. This was the extent of inquiry by the State regarding defendant's statement. Defendant claims it was improper lay witness testimony because Harth opined he considered defendant's statement an admission.

¶ 47    Harth's testimony that defendant's response to S.W.'s father constituted an "admission" was apparently based on what he read in Deputy Fleck's report. That is not an opinion. Instead, he was relating what he learned from another police officer in the investigation. Police officers are permitted to testify about information they receive during the course of an investigation to explain why they arrested a defendant or took other action, and such testimony is not hearsay because it is offered to show the steps the officer took, rather than for the truth of the matter asserted. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 21, 62 N.E.3d 1081. Here, Harth said nothing about the actual substance of the conversation between S.W.'s father and Deputy Fleck. Instead, he reported what Fleck wrote, and only on cross-examination did he then testify to the substance of the conversation. A police officer's testimony that avoids the substance of conversations with third parties and instead focuses on what the officer did next as part of his investigatory procedures is not hearsay. *People v. Gacho*, 122 Ill. 2d 221, 248, 522 N.E.2d 1146, 1159 (1988).

¶ 48    Detective Harth did not testify to the substance of defendant's statements during the State's direct examination. He testified he considered defendant's alleged statements important to the investigation and considered them "an admission." It is evident, when reviewing the testimony in context, the State then focused on the next steps in the investigatory process. The State

inquired about efforts to contact defendant and his father and the course of the investigation in general. The relevance of defendant's admission was that it caused the investigation to focus on him. Harth's explanation of that process takes it outside the realm of hearsay. *Gacho*, 122 Ill. 2d at 248; see *People v. Simms*, 143 Ill. 2d 154, 174, 572 N.E.2d 947, 954-55 (1991) (finding testimony describing the progress of a police investigation is admissible even if it suggests that a nontestifying witness implicated the defendant).

¶ 49　　In addition, even if it were hearsay, it was the product of a cross-examination clearly intended to attempt to discredit the quality and credibility of the investigation leading to defendant's arrest, all of which is fair game for defense counsel. Counsel sought to show the difference between what S.W.'s father testified he told Fleck and what Fleck apparently put in his report, upon which Harth relied during his investigation. Counsel obviously wanted the hearsay evidence before the jury to show what he considered to be errors in the investigation. This is not error, nor is it the basis for a claim of ineffective assistance. Instead, it is sound trial strategy. Any seasoned criminal defense counsel would be inclined to agree that some of the best defense comes from showing the errors or mistakes in the State's investigation. The defendant must overcome the strong presumption that counsel's actions are matters of trial strategy, and they are generally immune from claims of ineffective assistance of counsel. *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908.

¶ 50　　Here, counsel's intent was clear—discredit the accuracy and quality of the investigation by showing how information was conveyed inaccurately and without independent verification. Taken in context, the questions eliciting testimony from Harth attempting to discredit defendant's admission and Harth's investigation was a reasonable strategy for defense counsel to undertake. See *People v. Smith*, 326 Ill. App. 3d 831, 841, 761 N.E.2d 306, 316 (2001) (defendant must overcome a strong presumption that defense counsel's conduct "falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy" (citing *Strickland*, 466 U.S. at 689)). Defendant fails to establish how trial counsel's strategy was objectively unreasonable. *Valdez*, 2016 IL 119860, ¶ 14. As a result, defendant has failed to carry his burden of showing the trial court committed reversible error in allowing the testimony from S.W.'s father and Detective Harth. *Clendenin*, 238 Ill. 2d at 317-18. The fact that counsel received responses he did not like, and in hindsight wishes the questions had not been asked, is neither error nor ineffective assistance. Because there was no clear and obvious error, we decline to consider this issue under either prong of plain-error analysis. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1188 (2010).

¶ 51　　　　　　　　　　E. Sufficiency of Rule 431(b) Admonishments

¶ 52　　Defendant contends the trial court committed "clear and obvious" error when it "failed to implement the precise question-and-response framework required by the Illinois Supreme Court." There are two things wrong with this statement: (1) we, and several other districts, have found this not only is not "clear and obvious" error, but it is no error at all, and (2) the Illinois Supreme Court has never "required" a precise question-and-response framework. More importantly, our supreme court in *People v. Birge*, 2021 IL 125644, has now made it clear the questioning that occurred here complies with Rule 431(b) and the previous holdings of the Illinois Supreme Court.

¶ 53　　Defendant's claim here, as in *Birge*, was that the trial court's "collapsing" of the four *Zehr* (see *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984)) principles into one statement of

- 11 -

the law violates the Illinois Supreme Court's directives in *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 410 (2010).

¶ 54　　Whether a trial court has violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and, if so, the effect of noncompliance, is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26, 983 N.E.2d 1015; *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693. The rule is simple—the trial court is to ask each prospective juror whether that juror *understands* and *accepts* the following principles:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 55　　In this case, the trial court relayed its first questions to the panel of prospective jurors as follows:

> "I'm going to read to you now the principles of law, some of which I touched on previously, but we will go over this again just to make sure you understand this. The question that I am asking you is, 'Do you understand and accept these principles of law,' and then I'm gonna read to you the principles of law and then ask you individually if you understand and accept these principles of law.

> 　First principle is that the Defendant is presumed innocent of the charges against him. The second principle is that before a Defendant can be convicted, the State must prove the Defendant guilty beyond a reasonable doubt. The third principle is that the Defendant is not required to offer any evidence on his own behalf. The fourth principle is that if a Defendant does not testify, you cannot hold that against him."

¶ 56　　What defendant fails to note in his brief is that the trial court then inquired individually of each prospective juror, by name, "do you understand and accept those principles of law?" All 15 prospective jurors answered affirmatively.

¶ 57　　For the next panel of prospective jurors, the trial court repeated the process. This method is almost identical to that recently given our supreme court's imprimatur as compliant with Rule 431(b). See *Birge*, 2021 IL 125644, ¶ 38.

¶ 58　　As the supreme court noted, neither the rule nor the supreme court requires the trial court to address each principle "separately." *Birge*, 2021 IL 125644, ¶ 34. As such, there is no error, and without error there is no plain error. *People v. Downs*, 2015 IL 117934, ¶ 33, 69 N.E.3d 784.

¶ 59　　　　　　　　　　　　　　　　F. Defendant's Sentence

¶ 60　　Lastly, defendant argues the trial court abused its discretion by sentencing him to an aggregate term of 35 years for all four counts, contending the trial court punished defendant for exercising his right to a trial, placed too much emphasis on deterrence, and failed to consider defendant's potential for rehabilitation.

¶ 61　　At the time of sentencing, defendant was *pro se*. Defendant's presentence investigation report revealed he had no prior criminal record, was employed before the commission of the offense, graduated college, and had no history of substance abuse or mental health issues. At the sentencing hearing, it was stipulated by the parties that defendant was accepted into

graduate school at Southern Illinois University at Edwardsville before he committed these offenses.

¶ 62    The State also presented two victim impact statements from S.W.'s mother and grandmother. Both relayed the devastating impact defendant's actions had on their family and to S.W. Defendant presented no evidence in mitigation and declined to exercise his right to make a statement in allocution. The State asked for 15 years on counts I and III, to be served consecutively, and 5 years on counts IV and V. Defendant requested "leniency" and asked the court to "entertain a sentence of probation."

¶ 63                                    1. "*The Trial Tax*"

¶ 64    "The sentence imposed by the trial court is entitled to great deference and will not be reversed on appeal absent an abuse of discretion." (Internal quotation marks omitted.) *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 39, 126 N.E.3d 787. In *People v. Ward*, 113 Ill. 2d 516, 499 N.E.2d 422 (1986), the supreme court discussed the deference normally granted to trial courts' sentencing decisions: " 'We continue to find that the trial court is normally the proper forum in which a suitable sentence is to be determined and the trial judge's decisions in regard to sentencing are entitled to great deference and weight.' " *Ward*, 113 Ill. 2d at 526 (quoting *People v. Perruquet*, 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884 (1977)). However, the *Ward* court concluded, where the trial judge's *remarks* made it evident that "punishment was, at least in part, imposed because the defendant had refused to plead guilty but had instead availed himself of his constitutional right to trial, the sentence will be set aside." *Ward*, 113 Ill. 2d at 526. This only makes sense. In *Ward*, the court also cited its earlier decision in *People v. Moriarty*, 25 Ill. 2d 565, 566-67, 185 N.E.2d 688 (1962), where, again, the trial judge's comments made it clearly evident it was punishing the defendant for going to trial (he said so!).

¶ 65    How did we get to the point where, in reviewing the highly deferential decision of a trial court's sentence, a claimed "disparity" between an earlier plea offer by the State (especially one in which the court was not involved) and the court's ultimate sentence, with no comment or other evidence in the record, suggests we find not simply an abuse of discretion but evil, retributive intent on the part of the trial court?

¶ 66    In *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26, 139 N.E.3d 1027, the First District told us it must be "clearly evident" that a harsher sentence resulted from a defendant's demand for trial. However, the court in *Jones-Beard* went on to say that "[t]his evidence can come when a trial court makes explicit remarks concerning the harsher sentence [citations], *or where the actual sentence is outrageously higher than the one offered during plea negotiations*." (Emphasis added.) *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. We noted this same language in *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 113, 126 N.E.3d 703, and *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 69, 141 N.E.3d 320. Although we did not address it when deciding *Sturgeon* or *Musgrave*, in light of the record before us, we do so now. Where did this italicized language come from, and what constitutes an "outrageously higher" sentence? *Jones-Beard* cited *People v. Dennis*, 28 Ill. App. 3d 74, 78, 328 N.E.2d 135, 138 (1975), as its example of an "outrageously higher" sentence and authority for creating the inference a defendant was penalized for proceeding to trial. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26. However, in *Dennis*, a case self-described as limited to its unusual facts, the First District held, "we believe that a 'reasonable inference' of a constitutional deprivation may be

drawn where a great disparity exists between the sentence offered at a pretrial conference *to which the trial judge was a participant* and one imposed at the conclusion of a jury trial." (Emphasis added.) *Dennis*, 28 Ill. App. 3d at 78. The *Dennis* court concluded the "disparity" between the State's offer of 2 to 6 years with an ultimate sentence of 40 to 80 years, *after plea negotiations in which the trial court was involved*, permitted such inference. The only other authority upon which the *Dennis* court relies is a comment, unsupported by citation, in *People v. Jones*, 118 Ill. App. 2d 189, 197, 254 N.E.2d 843, 847 (1969), another First District case, in which the court found, apparently based solely on the disparity of sentences given to two codefendants by the same judge, that "[i]t seems to be a reasonable inference that Jones was penalized for exercising his constitutional rights." See *Dennis*, 28 Ill. App. 3d at 77-78. The *Jones* court cited nothing else in the record to justify this "reasonable inference," concluding, "after considering the nature of the offense and the attendant facts and circumstances here [(*i.e.*, the case-specific facts)], that it is manifest from the instant record that the sentence is excessive and not justified by any reasonable view which might be taken of the record." *Jones*, 118 Ill. App. 2d at 198. Although this "reasonable inference" analysis has had limited support in other First District cases, even there, other than *Dennis*, when cited at all, *Jones* is referenced within the context of either disparate sentences between codefendants or excessive sentences in general and not for the claimed "reasonable inference" of a "trial tax" as in this case. See, *e.g.*, *People v. Utinans*, 55 Ill. App. 3d 306, 325, 370 N.E.2d 1080, 1093 (1977) (finding that, although a penalty for exercising the right to trial *may be inferred* from the length of sentence imposed on a defendant convicted after trial as compared with a sentence given by the same judge to a similarly involved codefendant who pled, such an inference is not compelled); *People v. Grau*, 29 Ill. App. 3d 327, 332, 330 N.E.2d 530, 534 (1975); *People v. Hayes*, 133 Ill. App. 2d 114, 116-17, 264 N.E.2d 23, 25-26 (1970) (finding a claimed disparity of sentence between two codefendants); *People v. Taylor*, 6 Ill. App. 3d 343, 353, 285 N.E.2d 489, 497 (1972) (holding that a reviewing court will not interfere with a sentence imposed upon a defendant unless it is manifest from the record the sentence is excessive).

¶ 67    Unlike *Dennis*, none of the other cases citing *Jones* cite it in support of the idea that a disparity between a plea offer and the sentence of an individual defendant can somehow create a " 'reasonable inference' of a constitutional deprivation." *Dennis*, 28 Ill. App. 3d at 78. *Jones* referenced it only in the context of disparate sentences between similarly situated codefendants. *Jones*, 118 Ill. App. 2d at 197. Even *Dennis* limited its extension of *Jones* to those situations where there were pretrial plea discussions "to which the trial judge was a participant." *Dennis*, 28 Ill. App. 3d at 78. Although *Dennis* gets cited repeatedly in support of the inference based on this disparity alone, other districts and even other panels of the First District have noted how *Dennis* "limited its holding to its unusual facts." *People v. Johnson*, 2018 IL App (1st) 153634, ¶ 19, 107 N.E.3d 333; *People v. Peddicord*, 85 Ill. App. 3d 414, 422, 407 N.E.2d 89, 94 (1980) ("[T]he holding [in *Dennis*] is expressly limited to the facts of that case.").

¶ 68    *Jones-Beard* also involved a situation where the trial court engaged in an Illinois Supreme Court Rule 402 (eff. July 1, 2012) conference, participating in the negotiations and offering to sentence the defendant to seven years in exchange for a plea of guilty. Rejecting the offer and proceeding to a bench trial, the defendant was sentenced to 15 years by the same judge, claiming on appeal he was subject to a "trial tax" as defendant claims here. The First District, after citing *Dennis* as an example of an "outrageously higher" sentence, found defendant's

sentence alone was not sufficient evidence from which to conclude he had been subject to a "trial tax." *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 27. In each instance in which the concept has been espoused, the trial court was involved in pretrial plea negotiations. Defendant's claim the trial court abused its discretion by imposing a higher sentence because defendant refused to plead guilty was not based on any of the trial court's comments but rather because the sentence was harsher than the State's final plea offer. The disparity between the State's plea offer and defendant's sentence does not presuppose a punishment for availing himself of his right to a trial. Defendant cites no case permitting that assumption, and for good reason, as none exists. "[T]he mere fact that the defendant was given a greater sentence than that offered during plea bargaining does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for demanding trial." *People v. Carroll*, 260 Ill. App. 3d 319, 348-49, 631 N.E.2d 1155, 1174 (1992) (collecting cases). Instead, this disparity may simply reflect an inducement offered to defendant to plead guilty in exchange for a sentence less than that which is ordinarily warranted, which is not improper. *People v. Parsons*, 284 Ill. App. 3d 1049, 1064, 673 N.E.2d 347, 357 (1996). "[T]here is nothing inherently unconstitutional in increasing a sentence after trial." *Parsons*, 284 Ill. App. 3d at 1064. In fact, "trial courts have the right to impose a greater sentence after trial than at the time of a guilty plea." *People v. Peterson*, 311 Ill. App. 3d 38, 53, 725 N.E.2d 1, 13 (1999). As we have previously stated in *People v. Sanders*, 198 Ill. App. 3d 178, 188, 555 N.E.2d 812, 819 (1990): "Of course defendants are going to be offered an incentive to plead guilty, usually by way of a reduced sentence. There are not many defendants who plead guilty solely to facilitate the criminal justice system. The offering of this incentive is neither improper nor any evidence of prosecutorial vindictiveness." (Emphases omitted.) The line of cases permitting an inference of wrongdoing based solely on the trial court's ultimate sentence is shaky at best but, even then, arises only under circumstances where the trial court was involved in the negotiation process. Otherwise, defendants would be permitted to claim not an abuse of discretion or manifest error but intentional evil on the part of a trial court because of a difference between a proposed plea offer in which the court was never involved and a sentence the court imposed after (1) hearing all the evidence; (2) observing the witnesses, the defendant, and the victim(s) during trial; (3) reading a presentence report; (4) hearing a victim's statement or reading victim impact statements; (5) listening to evidence in aggravation and mitigation; and (6) considering the defendant's statement in allocution. Neither *Jones* nor *Dennis* intended for the inference they suggested to be stretched this far.

¶ 69 Here, the State offered defendant a plea to a Class 2 felony and probation, undoubtedly, in part, to avoid having to put a 10-year-old child through the ordeal of testifying about a long-standing pattern of sexual abuse by her uncle. Having refused the plea, defendant was otherwise subject to, if convicted, sentencing for mandatory consecutive Class X felonies.

¶ 70 Also, during a trial, a trial court will undoubtedly hear more about the facts of the case, details regarding the nature and circumstances of the offense, and testimony from witnesses and victims. "[A] sentence greater than that offered before trial may be explained by the court's consideration of additional evidence regarding the circumstances of the crime admitted at trial." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 14, 129 N.E.3d 150. The additional information learned at trial, as well as the appearance, demeanor, and reactions of witnesses and the defendant, are all missing from a dry recitation of a minimal factual basis provided at the time of a plea. *Peterson*, 311 Ill. App. 3d at 53 (finding the trial judge may gather a greater

appreciation of the nature and extent of the crime during a trial and the trial judge may gain insight into defendant's moral character and suitability for rehabilitation based on his or her conduct during trial). Further, we have also stated it must be "clearly evident" from the record the trial court imposed a harsher sentence because defendant demanded a jury trial. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 117. Further, it must be clearly evident the trial court's sentence was imposed as punishment due to the defendant's rejection of the State's plea offer. See *Musgrave*, 2019 IL App (4th) 170106, ¶ 76.

¶ 71    There is nothing in the record, nor does defendant point us to anything, making it clearly evident the trial court imposed a more severe sentence as punishment for defendant's decision not to plead guilty. Where the trial court is not involved in the plea-bargaining process, we emphatically reject the notion that a permissible inference arises that a "trial tax" was imposed instead of the exercise of a trial court's independent discretion at sentencing. Unless the trial court was involved in the plea-bargaining process, whatever the terms of the plea offer made to defendant during pretrial, it is a nonissue when it comes to sentencing. The trial court was in the best position to consider an appropriate sentence, and we find nothing to evince an abuse of discretion based on this claim. *Ward*, 113 Ill. 2d at 525-26.

¶ 72                            2. *Mitigating and Aggravating Factors*

¶ 73    "A reviewing court must afford great deference to the trial court's judgment regarding sentencing because that court, having observed the defendant and the proceedings, is in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits than a reviewing court, which must rely on a 'cold' record." (Internal quotation marks omitted.) *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 41, 2 N.E.3d 333. "When imposing a sentence, the trial court must consider statutory factors in mitigation and aggravation, but the court need not recite and assign a value to each factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38. In *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24, 959 N.E.2d 703, this court said that "[t]he balance to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion that should not be disturbed absent an abuse of discretion." A sentencing court "is not obligated to recite and assign value to each factor it relies upon, nor does it need to place greater weight on defendant's rehabilitative potential than on the seriousness of the offense or the need to protect the public." *People v. Mayoral*, 299 Ill. App. 3d 899, 913, 702 N.E.2d 238, 248 (1998). "The seriousness of the offense is one of the most important factors for the court to consider." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28, 82 N.E.3d 693.

¶ 74    Defendant presented no evidence in mitigation, and nothing in the record reflects a failure by the trial court to consider any relevant mitigating evidence contained in the presentence investigation report. Instead, defendant merely claims, without citation to the record, the court overlooked factors in mitigation, including defendant's "general moral character, social environment, and education." There is a presumption the trial court considered any mitigating evidence before it. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 42. The fact that mitigation may exist does not require the trial court to reduce a sentence that is otherwise within the statutory range of sentences allowed. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 42. And " '[t]he trial court is not required to expressly indicate its consideration of all mitigating factors and what weight each factor should be assigned.' " *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43 (quoting *People v. Kyse*, 220 Ill. App. 3d 971, 975, 581 N.E.2d 285, 288 (1991)). It is the defendant's

burden to show, by referencing explicit evidence in the record, that the trial court failed to consider mitigating evidence. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. Defendant was facing a total sentence of 67 aggregate years. The evidence and testimony from S.W., her parents, the treating physician, the CAC interviewer, and the CAC interview itself demonstrated defendant, S.W.'s uncle, repeatedly sexually abused and assaulted a seven-year-old girl during the summer of 2015.

¶ 75     The trial court expressly stated for the record its consideration of all statutory factors in aggravation and mitigation and referenced the seriousness of the offense, calling the facts "horrifying," and it said, "words don't justify *** the nature of the offense." Additionally, the court mentioned deterrence as a relevant factor in aggravation. Both the seriousness of the offense and deterrence are appropriate statutory factors for the court to consider. See *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53, 23 N.E.3d 430 ("[T]he seriousness of an offense is considered the most important factor in determining a sentence."); see also 730 ILCS 5/5-5-3.2(a)(7) (West 2018) (a sentence necessary to deter others from committing the same crime is a factor in aggravation). Although the trial court did not specifically reference particular factors in mitigation, it was not required to do so. *McGuire*, 2017 IL App (4th) 150695, ¶ 38. We presume other mitigation by way of the presentence investigation report, and the stipulation of defendant's admission to graduate school, although not vocalized by the trial court, was properly considered. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. The trial court's aggregate sentence of 35 years is in accord with the State's recommendation and falls within the middle of the range of possible sentences defendant could have received. A sentence within the statutory guidelines is presumed to be proper, and we will not disturb the sentence absent an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46, 19 N.E.3d 1070.

¶ 76     We will not reweigh the factors considered by the trial court, as defendant asks us to do (see *Etherton*, 2017 IL App (5th) 140427, ¶ 26), and we do not find the sentence imposed was an abuse of discretion.

¶ 77                                          III. CONCLUSION

¶ 78     For all the reasons set forth above, we affirm the judgment and sentence of the trial court.

¶ 79     Affirmed.