NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220347-U

NO. 4-22-0347

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 15, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DOUGLAS LYNN MANLEY, | ) | No. 20CF683 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court vacated two of defendant's convictions for resisting a peace officer where the evidence proved that defendant committed a single act of resisting arrest. Defendant's conviction for criminal trespass to real property was affirmed where the county sheriff had statutory authority to maintain courthouse security and to order defendant to leave the premises. The appellate court held that defendant's prison sentence for felony resisting a peace officer causing injury was not excessive.

¶ 2    Defendant, Douglas Lynn Manley, appeals his convictions of resisting a peace officer causing injury (720 ILCS 5/31-1(a), (a-7) (West 2020)) and criminal trespass to land (720 ILCS 5/21-3(a)(3) (West 2020)) following a jury trial. Defendant contends that his sentence to the Illinois Department of Corrections was excessive, his convictions of three counts of resisting a peace officer violated the one-act, one-crime rule, and the evidence was insufficient to prove defendant guilty beyond a reasonable doubt of criminal trespass to land. We affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4            On July 21, 2020, defendant was charged by information with three counts of resisting a peace officer (720 ILCS 5/31-1(a), (a-7) (West 2020)) (counts I-III). Count I charged that defendant resisted Deputy Jayson Kessinger's attempt to handcuff him and that defendant's resistance caused an injury to Kessinger. Count II charged that defendant resisted Deputy Jason Hammond's attempt to arrest him. Count III charged that defendant resisted Deputy Jordan Krone's attempt to arrest him. The information also charged defendant with one count of criminal trespass to a building (720 ILCS 5/21-3(a)(1) (West 2020)) (count IV) and one count of criminal trespass to land (720 ILCS 5/21-3(a)(3) (West 2020)) (count V). On August 5, 2020, count I of the information was superseded by an indictment for resisting a peace officer causing injury (720 ILCS 5/31-1(a-7) (West 2020)). The superseding indictment charged the identical offense that count I of the information had charged. Before trial, the State dismissed count IV of the information. Defendant proceeded *pro se* to a jury trial on the superseding indictment and the remaining counts of the information. We include those facts necessary to understand the issues raised in this appeal. We will include additional facts as necessary in the analysis section of this Order.

¶ 5                                    A. The State's Case

¶ 6            Lieutenant Matt Lane of the McLean County Sheriff's Department testified as follows. On July 21, 2020, Lane was in charge of security at the McLean County courthouse. The chief judge had ordered that no one except parties, litigants, and attorneys were allowed entrance to the courthouse due to the COVID-19 pandemic. The number of people allowed inside the courthouse was also limited.

¶ 7         Deputy Jason Hammond testified that he and Deputy Jordan Krone screened persons at the courthouse entrance on the morning of July 21, 2020. They allowed only those persons with court business into the facility.

¶ 8         Hammond testified that defendant and a woman approached the deputies the morning of July 21, 2020. The woman confirmed that she had a court appearance. Defendant said he was the woman's attorney. When the deputies asked to see defendant's bar identification, defendant refused. The deputies then asked defendant multiple times to leave the courthouse. Hammond testified that defendant ran past security and through the metal detectors. According to Hammond, defendant was "very agitated, very angry, very loud," and was yelling profanities. Defendant was protesting that the deputies were violating his constitutional rights. Hammond testified that he physically blocked defendant from entering through the metal detectors. (This testimony was contradicted by a surveillance video showing that defendant walked back through the metal detectors on his own before Hammond was able to stop him from entering through security.)

¶ 9         Hammond testified that the deputies ordered defendant to leave the property of the Law and Justice Center, not just the building itself, because defendant was causing a public disturbance. Deputy Jayson Kessinger, who had joined Hammond and Krone, placed defendant under arrest after defendant threatened to "get" the deputies. Hammond testified that defendant yanked his arm away as Kessinger attempted to place handcuffs on defendant. During the struggle, Kessinger was cut. Hammond identified videos taken by security cameras that morning and described their contents to the jury as the videos depicted the events concerning defendant.

¶ 10        Krone testified that at about 9:30 a.m. on July 21, 2020, defendant appeared at the courthouse entrance accompanying a woman who confirmed she was there for a court appearance.

Krone testified that defendant denied he needed to be an attorney or a litigant to enter the courthouse. According to Krone, defendant stated the constitution gave him permission to enter the premises. Krone described defendant as "hostile." Krone testified that defendant walked through the metal detectors but was turned back by Hammond.

¶ 11 Krone testified that defendant was loud and causing a disturbance, so the deputies ordered defendant to leave the premises. Kessinger arrived, and the three deputies inched defendant toward the exit, repeating their commands for him to leave. Krone testified that they were outside the building when defendant threatened to "get" Hammond. Then, Kessinger told defendant he was under arrest for trespass. According to Krone, defendant walked away. Kessinger then grabbed defendant's arms to place defendant in handcuffs. Krone also had one of defendant's arms, but defendant pulled away. Krone testified that Kessinger received a cut on his hand while attempting to handcuff defendant.

¶ 12 The video of defendant's encounter with the deputies inside the courthouse lobby showed the following. Defendant and a woman (later identified as Gayle Norbury) approached a counter adjacent to a conveyor and magnetometer. Defendant was carrying a slim manila folder. Two uniformed officers (identified as Hammond and Krone) were behind the counter. While they engaged defendant in conversation, Norbury waited but then placed her belongings on the conveyor, proceeded through the magnetometer, and disappeared from the screen. The deputies continued to engage defendant in conversation, during which defendant's gestures became animated. Defendant then bypassed screening and strode purposefully through the magnetometer, but he reversed stride before Hammond reached him. Then, defendant opened the folder he was carrying and appeared to argue with the deputies about something in the folder. Defendant's

gestures were excited. The deputies began steering defendant toward the exit. A third deputy (identified as Kessinger) appeared, and the three deputies escorted defendant outside the building.

¶ 13 Kessinger testified that he was called to assist Hammond and Krone on the morning of July 21, 2020. When Kessinger arrived at their location, the deputies were telling defendant to leave the premises. According to Kessinger, the three deputies formed a "wall" and backed defendant outside the building. Kessinger testified that he then ordered defendant to leave the property or be arrested. When defendant stepped forward instead of leaving, Kessinger told defendant he was under arrest. Defendant then walked quickly away from Kessinger. Kessinger caught up to defendant, who then turned aggressively on Kessinger. Kessinger testified that he grabbed defendant's left arm and placed a handcuff on it. Kessinger testified that his right hand was cut while he was trying to place the right handcuff on defendant. Kessinger testified that he felt pain and later wiped blood off his hand with a paper towel. According to Kessinger, defendant was "actively resisting" by "[t]ugging, pulling, [and] tightening up." Kessinger identified a photograph depicting the wound on his hand after he wiped off the blood. Kessinger also identified a video depicting the incident, during which he described defendant as screaming obscenities and making lewd hand gestures at the deputies.

¶ 14 The videos of the plaza surrounding the courthouse showed the following. Defendant left the building. The deputies came out behind him, making shooing gestures at defendant, as if indicating for defendant to leave the premises. Defendant walked away a distance but then circled back toward the building. The deputies then formed a solid line and walked defendant toward the perimeter of the plaza.

¶ 15 As defendant walked quickly from the right of the screen toward the left, Kessinger ran and caught him. Defendant appeared to move his arms behind his back to submit to handcuffs,

but then he pulled away as Hammond and Krone joined Kessinger. Defendant continually struggled and pulled away from the deputies as they attempted to handcuff him. After the deputies handcuffed defendant behind his back, they walked defendant back inside the courthouse.

¶ 16 Following Kessinger's testimony, the State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 17                                                  B. Defendant's Case

¶ 18 Norbury testified that she appeared in court on July 21, 2020, on a charge of driving on a revoked license. Norbury testified that she was disabled with multiple sclerosis and that she was also cognitively impaired. Norbury described defendant as her "significant other," who assisted her. According to Norbury, defendant accompanied her to court that morning as her family member and counsel. When she and defendant arrived at the courthouse, she told the deputies about her court date, but she did not tell them about her disabilities. Defendant told the deputies that Norbury had the constitutional right to have someone with her. Norbury testified that she "definitely" wanted defendant to be there. According to Norbury, she was relying on the constitution in asserting defendant's right to accompany her to court. Norbury testified that defendant was carrying a "stack of paperwork" that morning showing his right to be with her in court.

¶ 19 Defendant testified on his own behalf in narrative form, as follows. Defendant testified that he agreed to accompany Norbury to court on July 21, 2020, because of Norbury's disabilities and because he is "very versed" in both "manmade" and "natural" law. At about 9:45 a.m., they arrived at the courthouse. Norbury told the officers she had a court date. Defendant explained to the officers that he was there to "console" Norbury and consult with her as her counsel, even though he was not an attorney. Defendant testified that it is the right of Americans

to have counsel, who need not be an attorney. Defendant testified that the officers stated that he could not enter due to the pandemic. Defendant testified that the pandemic does not suspend the constitution, which is what tells us what we can and cannot do. Defendant testified that he left the building when the officers asked him to leave. According to defendant, he was not creating a controversy but, rather, was "addressing [his] grievances." According to defendant, he stopped immediately when ordered to do so and placed his hands behind his back to be handcuffed. Defendant testified that it caused him discomfort, so he moved from "side to side" to take the weight off his foot. Defendant testified that the officers wrongly interpreted that movement as resisting arrest. Defendant stated that he "offered" himself to the officers because he knew they had to do their jobs. Defendant testified that he had an envelope in his hand, which could have been what caused Kessinger's injury. Defendant testified that he was "completely compliant" with the officers, except when one of them stuck his hand down defendant's waistband, which "freaked [defendant] out." On cross-examination, defendant testified that he complied with the deputies' orders to leave the building, only he failed to comply fast enough to suit the officers. Defendant also testified that he had the right to enter the building. On redirect examination, defendant again testified in narrative form that it was his "right to inquire into why I was being asked to leave." Defendant testified that he "had to ask questions" and needed answers so he could later file a formal complaint against the deputies. Following his testimony, defendant rested.

¶ 20                                    C. Rebuttal and Verdict

¶ 21          In rebuttal, the State introduced defendant's two prior convictions for felony domestic battery. The trial court instructed the jury that defendant's previous convictions could be considered only as they affected the believability of the witness. The State rested. The jury convicted defendant of all charges. Defendant did not file any posttrial motions.

¶ 22                                    D. Sentencing

¶ 23        Defendant's sentencing hearing was held on December 17, 2021. Defendant again represented himself. The trial court admitted the presentence investigation report into evidence over defendant's objection that neither the state's attorney, his assistants involved in the case, nor the trial judge were authorized to practice law. The State recommended a period of four years' incarceration on defendant's conviction on count I (the superseding indictment charging resisting with injury to Kessinger). That recommendation was based on defendant's prior convictions, the nature of the present offense, and defendant's previous noncompliance with community-based sentences.

¶ 24        Defendant disputed certain of the prior criminal convictions noted in the presentence investigation report. Defendant then argued that he did not intend to cause a disturbance when he accompanied Norbury to court. Defendant argued that he relied on the Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2020)) in asserting his right to attend court proceedings. Defendant maintained that the deputies' orders for him to leave the Law and Justice Center were unconstitutional as they denied him the right to participate in a governmental function. Defendant denied that he resisted arrest. Defendant also asserted that there was no evidence showing how Kessinger got a cut. Defendant argued against imprisonment, stating that he was 57 years old, tired, not in good health, and solely responsible for caring for Norbury. Defendant argued that his criminal past was due to being younger and "[not] very smart."

¶ 25        The trial court stated that it considered the presentence investigation report, the evidence and arguments presented, and all of the factors in aggravation and mitigation. The court noted that the deputies showed patience with defendant when he insisted on entering the courthouse, ran through the metal detectors, and disrupted the flow of courthouse traffic. The court

found that courthouse security was jeopardized because everyone was focused on defendant for an extended period of time. The court noted that defendant's record consisted of "many misdemeanors," "several felony offenses," and "does not include a *** record of success on probation." The court noted:

> "[The presentence investigation report] shows probation sentence [*sic*] as being terminated unsatisfactorily on multiple occasions. It shows the defendant failing to follow through with recommendations while on probation. It demonstrates the defendant's reluctance to ever accept responsibility for his own conduct."

¶ 26 The trial court further noted that a 2013 mental health examination showed that defendant "takes no responsibilit[y] for his behaviors," is "very blaming of the victims" and the legal system, and is "too toxic" for group counseling. The court noted that defendant was also unsuccessful in individual counseling. The court found that further community-based sentencing would deprecate the seriousness of the offense. The court sentenced defendant to three and a half years' incarceration on count I (the superseding indictment) plus fines and court costs. As to defendant's convictions on counts II and III of the information (resisting a peace officer), the court fined defendant $75 plus court costs and ordered defendant to serve 48 hours in jail. (The written financial sentencing order reflects only the fines and court costs.) As to count V of the information (criminal trespass to land), the court imposed a fine of $75 and court costs. The court denied defendant's *pro se* motion to reconsider the sentence.

¶ 27 Defendant obtained a supervisory order from our supreme court allowing him to file a late notice of appeal on October 28, 2022.

¶ 28 II. ANALYSIS

¶ 29    Defendant, who is now represented by counsel, raises three arguments: (1) the sentence of three and a half years' incarceration on count I (superseding indictment) was excessive, (2) defendant's convictions of three counts of resisting arrest violated the one-act, one-crime rule, and (3) the evidence was insufficient to support defendant's conviction of criminal trespass to land.

¶ 30                    A. Defendant's Sentence Was Not Excessive

¶ 31    Defendant contends that his sentence of three and a half years in prison for resisting a peace officer was disproportionate to the trivial nature of Kessinger's injury. Defendant also argues that the trial court did not consider his poor health and his need to care for Norbury. Additionally, defendant argues that the court ignored his reasonable reliance on supreme court guidelines stating that a family member or friend could accompany *pro se* litigants to court during the pandemic. Defendant requests that we reduce his sentence for felony resisting arrest to two years' incarceration. Alternatively, defendant requests that we remand for resentencing.

¶ 32    It is well-settled that a trial court has broad discretion when imposing a sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Absent an abuse of that discretion, we cannot alter a sentence on review. *Stacey*, 193 Ill. 2d at 209-10. A reviewing court accords the trial court's sentencing decision great deference because the trial court is generally in a better position to determine the appropriate sentence. *Stacey*, 193 Ill. 2d at 209. The trial court can weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Stacey*, 193 Ill. 2d at 209. A sentence that is within statutory limits will be deemed excessive and the result of an abuse of discretion only where the sentence is greatly at variance with the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 209-10.

¶ 33        Here, the superseding indictment charged defendant with resisting a peace officer causing injury. This offense is a Class 4 felony for which the sentencing range is one to three years' incarceration. 730 ILCS 5/5-4.5-45(a) (West 2020). However, the maximum prison sentence for an extended-term Class 4 felony is six years. 730 ILCS 5/5-8-2 (West 2020). Here, defendant concedes he was eligible for the extended term due to his prior convictions. Defendant also concedes that his sentence of three and a half years' incarceration was within the statutory limits. Nevertheless, defendant argues that the sentence was an abuse of discretion because Kessinger's injury was only a minor cut to the base of his right index finger.

¶ 34        Acts of struggling and wrestling with a police officer are physical acts that constitute resisting and will support a conviction for resisting a peace officer even if the underlying attempted arrest was unwarranted. *People v. Miller*, 199 Ill. App. 3d 603, 611 (1990). The evidence showed that Kessinger was cut during the struggle to handcuff defendant. Defendant characterizes the injury as a "paper cut," though the photograph depicts a round wound with flesh missing, and Kessinger testified that it caused him pain. Kessinger also testified that he wiped off blood before the photograph was taken. Defendant acknowledges that the cut to Kessinger's finger was serious enough to constitute an "injury" within the meaning of the felony resisting or obstructing statute. See *People v. Bethel*, 2022 IL App (1st) 200049-U, ¶ 28 (holding that "injury" for purposes of the statute means an act that causes bodily pain.) In *Bethel*, the court specifically noted that an injury causing pain is not a trivial injury. *Bethel*, 2022 IL App (1st) 200049-U, ¶ 28. Accordingly, we hold that defendant's sentence was not disproportionate to the nature of the offense.

¶ 35        Next, defendant argues that the trial court failed to consider the mitigating factor that defendant served as Norbury's caregiver. Norbury suffered from multiple sclerosis and cognitive impairment. Although the court did not specifically mention defendant's relationship

with Norbury in its remarks, the court noted that it considered all of the statutory factors in aggravation and mitigation. The trial court is not required to expressly indicate its consideration of all mitigating factors and the weight it assigned to each. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 74. Nor does the fact that mitigation exists require the court to reduce a sentence that is otherwise within the statutory range of permitted sentences. *Walker*, 2021 IL App (4th) 190073, ¶ 74.

¶ 36    For the same reasons, we reject defendant's argument that the trial court ignored defendant's own poor health as a mitigating factor. At sentencing, defendant told the court that he was 57 years old, tired, and not in good health. The presentence investigation report indicated that defendant suffered ongoing complications from an appendectomy. However, the court noted that it considered all matters in mitigation in making its sentencing determination. There is a presumption that the court considered all the relevant factors in determining the proper sentence and that presumption is not overcome unless the defendant presents explicit evidence from the record that the court did not consider mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Here, defendant merely argues that the court did not expressly articulate that it considered defendant's and Norbury's health, which is insufficient to overcome the presumption. See *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43.

¶ 37    Next, defendant argues that the trial court failed to consider that there were substantial grounds tending to excuse or justify his offense. See 730 ILCS 5/5-5-3.1(a)(4) (West 2020). Defendant maintains that he was acting pursuant to the supreme court's "Guidelines for Resuming Illinois Judicial Branch Operations During the COVID-19 Pandemic" when he attempted to enter the courthouse and then refused to leave. The guidelines provided, *inter alia*, that "[s]elf-represented litigants should be allowed to bring one friend or family member with them

into the courthouse." Defendant argues that his reasonable belief that he was being denied his constitutional right to attend court with Norbury lessens his culpability. Defendant asserts that the court did not consider this factor, but instead praised the deputies for their patience in trying to implement Lane's potentially illegal order to keep everyone except litigants out of the courthouse.

¶ 38 Defendant omits the evidence that he did not present his case for entering the courthouse to the deputies reasonably or rationally. The evidence showed that defendant used loud, abusive language and hand gestures and attempted to run through the metal detectors. It then took three deputies to escort defendant from the building. The evidence showed that the sheriff had six deputies detailed to courthouse security, and three of them were distracted from courthouse security while dealing with defendant. The evidence also showed that, even when defendant was outside the building, he continued his unruly behavior, which culminated in an injury to Kessinger. Defendant has not shown that anything in the supreme court's guidelines condones or excuses his disruptive conduct.

¶ 39 Lastly, defendant argues that the cumulative effect of the trial court's errors deprived him of a fair sentencing hearing. Because we find no error, we reject this argument. In addition to considering all of the factors in mitigation, the court also considered defendant's extensive criminal history and past poor response to community-based sentencing. The presentence investigation report showed defendant's long history of offenses and violations of probation as well as his failure to follow through with mental health treatment. Based upon this record, we cannot say that the sentence on count I, which was in the middle of the range permitted by statute, was an abuse of discretion.

¶ 40 B. Defendant's Three Convictions for Resisting a Peace Officer Violated the

One-Act, One-Crime Rule

¶ 41        A person is guilty of resisting a peace officer where the person knowingly obstructs the performance of one known to the person to be a peace officer of any authorized act within his or her official capacity. 720 ILCS 5/31-1(a) (West 2020). Here, the jury convicted defendant of three counts of resisting, and the trial court imposed three sentences. Defendant maintains that his behavior constituting resisting arrest consisted of one continuous act of twisting away from the deputies as they applied the handcuffs. Defendant argues that the one-act, one-crime doctrine prohibits three convictions for this one continuous act.

¶ 42        The one-act, one-crime rule prohibits convictions for multiple offenses based on the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. Defendant asks us to vacate the convictions relating to Hammond and Krone. See *In re Tyreke H.*, 2017 IL App (1st) 170406, ¶ 122 (stating that where a defendant is convicted of more than one offense arising from the same physical act, the conviction for the less serious offense must be vacated). The State argues that defendant's three convictions were proper, as his act of resisting arrest involved three separate officers.

¶ 43        Defendant concedes that he forfeited this issue by failing to raise it in the trial court. Nevertheless, defendant argues that the issue is reviewable under the plain-error doctrine. The plain-error doctrine allows a reviewing court to consider errors affecting a defendant's substantial rights where (1) the evidence was closely balanced or (2) the error was so serious as to affect the integrity of the judicial process. *People v. Morgan*, 385 Ill. App. 3d 771, 773-74 (2008). An alleged one-act, one-crime error is reviewable under the second prong of the plain-error doctrine because such error affects the integrity of the judicial process. *Smith*, 2019 IL 123901, ¶ 14. Conventional plain-error analysis requires us first to determine whether any error occurred. *People v. Vesey*,

2011 IL App (3d) 090570, ¶ 21. Whether a one-act, one-crime violation occurred is a question of law we review *de novo*. *Smith*, 2019 IL 123901, ¶ 15.

¶ 44 Defendant relies on the following factors in arguing that he committed but one physical act: (1) whether the defendant's actions were interposed by an intervening event, (2) the time interval between the successive parts of the defendant's conduct, (3) the victim's identity, (4) the similarity of the defendant's acts, (5) whether the defendant's conduct occurred in the same location, and (6) the State's intent, as shown by the charging instrument. *People v. Sienkiewicz*, 208 Ill. 2d 1, 7 (2003). Defendant argues that every factor except the third supports that he committed only a single act. Specifically, defendant asserts that there were no intervening events between those when defendant attempted to avoid arrest and that every "potential 'act' " of resistance occurred at the exact same location in the courthouse plaza. Defendant also maintains that the charging instruments and the State's closing argument alleged the identical conduct as to all three officers. We agree.

¶ 45 Count I (the superseding indictment) charged that defendant injured Kessinger by resisting Kessinger's application of handcuffs to defendant's wrists. Count I alleged that the resisting consisted of "physically struggling with Officer Kessinger and attempting to pull from the grasp of Officer Kessinger." Count II of the information charged that defendant resisted being arrested by "physically struggling with Officer Hammond and attempting to pull from the grasp of Officer Hammond." Count III of the information charged that defendant resisted being arrested by "physically struggling with Officer Krone and attempting to pull from the grasp of Officer Krone."

¶ 46 Hammond testified that the deputies and defendant were outside the courthouse in the plaza when Kessinger told defendant to leave the premises or be arrested. According to

Hammond, defendant stepped toward the deputies, yelling at them. Kessinger told defendant he was under arrest. Hammond testified that all three deputies then approached defendant. Hammond described what followed. Defendant turned and walked "briskly" away. Kessinger ran up to defendant. Hammond and Krone restrained defendant with their hands. Defendant took a step away. Kessinger attempted to double-lock handcuffs on defendant while Hammond and Krone searched defendant, but defendant "yanked" his arm away from Kessinger. On cross-examination, Hammond testified that he was on defendant's right side and Krone was on defendant's left side. Hammond testified that defendant resisted arrest by pulling away from the deputies the entire time they were attempting to take him into custody.

¶ 47 Krone testified that when Kessinger grabbed defendant by his arms, defendant put his hands behind his back as though complying with being placed under arrest. Krone stated that he was holding one of defendant's arms and felt defendant pull away from him.

¶ 48 Kessinger testified that they were outside the building when he gave defendant the "ultimatum" to leave "now" or be arrested. Kessinger stated that defendant "stepped forward," and Kessinger told defendant he was under arrest. Kessinger described what next occurred. Defendant walked away quickly, and Kessinger ran to catch him. Defendant turned on Kessinger aggressively. Kessinger grabbed defendant's left arm and placed a handcuff on it. Then Hammond and Krone arrived. Kessinger grabbed defendant's right arm and attempted to place the handcuff when defendant pulled away, and Kessinger's finger was caught in the handcuffs.

¶ 49 In his closing argument, the prosecutor described defendant's resisting pertaining to Kessinger as "pulling away and walking away from the officers as they were trying to restrain [defendant] in the handcuffs." Regarding the charge of resisting Hammond, the prosecutor argued: "It's the same acts that we just saw [pertaining to Kessinger]." The prosecutor stated:

"The officers are trying to hold [defendant's] arms so that they can put [the] handcuffs on him, the defendant continually pulls away, tries to walk forward, is moving his body around, resisting their attempts to place him into custody."

¶ 50 Regarding count III of the information, pertaining to resisting Krone, the prosecutor stated: "Count [III] is the same offense. *** Again, we have seen the video where the defendant is walking away, pulling his arms away from [Krone], resisting the efforts to place [defendant] into custody."

¶ 51 The surveillance video showed that after Kessinger told defendant he was under arrest, defendant fast-walked away from the deputies across the courthouse plaza. Kessinger ran after defendant and caught him at almost the same instant when Hammond and Krone arrived. Kessinger attempted to handcuff defendant behind his back, with Hammond and Krone on either side of defendant. Defendant weaved and tugged while all three deputies attempted to handcuff him. Defendant made a final lurch away from the deputies before they subdued him and escorted him back into the courthouse.

¶ 52 Multiple convictions for resisting arrest are appropriate where a defendant commits multiple acts of resisting against more than one officer. *People v. Floyd*, 278 Ill. App. 3d 568, 572 (1996). In *Floyd*, for instance, the defendant was convicted of four counts of resisting arrest. *Floyd*, 278 Ill. App. 3d at 569. After the complainant reported the defendant's inappropriate behavior toward her, six or seven police officers responded "in waves" to the defendant's attempt to resist arrest. *Floyd*, 278 Ill. App. 3d at 572. The police first attempted to place the defendant in handcuffs, then the defendant and four officers fell to the ground, and finally two different officers attempted to place the defendant into a squad car. *Floyd*, 278 Ill. App. 3d at 572. The incident lasted 15 minutes and consisted of "at least" four separate acts against four separate officers. *Floyd*, 278 Ill.

- 17 -

App. 3d at 572. In *People v. Wicks*, 355 Ill. App. 3d 760, 761 (2005), the defendant was convicted of two counts of resisting a peace officer. The appellate court upheld both convictions where the defendant refused to be arrested by pulling away from the first officer's grasp and then struggled with a second officer, who attempted to place the defendant in handcuffs. *Wicks*, 355 Ill. App. 3d at 765.

¶ 53        Here, defendant aptly distinguishes *Floyd* and *Wicks* based upon the length of time the acts of resisting lasted, the multiple sequences, and the number of police officers involved in those cases. By contrast, in our case, there was but one brief sequence in one location involving all three deputies.

¶ 54        The State argues that the one-act, one-crime doctrine applies only to multiple acts against a single victim, relying on our decision in *People v. Avelar*, 2017 IL App (4th) 150442, ¶ 25. The State maintains that multiple convictions are proper where there are separate victims, again relying on *Avelar*, 2017 IL App (4th) 150442, ¶ 25. In *Avelar*, we affirmed the defendant's three convictions of violation of an order of protection. *Avelar*, 2017 IL App (4th) 150442, ¶ 2. The defendant's three children were the subjects of a plenary order of protection. *Avelar*, 2017 IL App (4th) 150442, ¶ 5. In violation of an order of protection, the defendant took the children to a McDonald's restaurant, where an argument ensued between the defendant and his ex-girlfriend, who was the mother of the defendant's three children. *Avelar*, 2017 IL App (4th) 150442, ¶¶ 5, 7. The police were called, and they arrested the defendant for violation of the order of protection. *Avelar*, 2017 IL App (4th) 150442, ¶ 7. The State charged the defendant with three counts of violating the order of protection against three different victims. *Avelar*, 2017 IL App (4th) 150442, ¶ 26. We held that because three separate persons were protected under the order of protection, we need not reach the issue of whether the defendant's activity constituted a single act or multiple

acts. *Avelar*, 2017 IL App (4th) 150442, ¶ 26. We stated that the defendant violated the order of protection in three ways, as to three different victims. *Avelar*, 2017 IL App (4th) 150442, ¶ 30.

¶ 55 *Avelar* is inapposite. Our holding in that case was based on our analysis that the statute under which the defendant was charged did not prohibit multiple convictions based on multiple victims. *Avelar*, 2017 IL App (4th) 150442, ¶ 30. Also, in our case—as the prosecutor made clear in closing argument—the three counts of resisting a peace officer were all based on the same conduct. Accordingly, we vacate defendant's convictions of resisting a peace officer based on counts II and III of the information.

¶ 56 C. The Evidence Was Sufficient to Prove Defendant Guilty Beyond a Reasonable

Doubt of Criminal Trespass to Land

¶ 57 Count V of the information charged defendant with the offense of criminal trespass to land. A person commits criminal trespass to real property when he or she remains upon the land of another after receiving notice from the owner or occupant to depart. 720 ILCS 5/21-3(a)(3) (West 2020). This statute forbids remaining on property after being told to leave, even if the initial entry was lawful. *People v. DeRossett*, 237 Ill. App. 3d 315, 326 (1992). Here, the evidence showed that the deputies instructed defendant to leave not only the courthouse, but also the plaza constituting the courthouse grounds, multiple times, and defendant refused to leave.

¶ 58 Defendant contends that McLean County was the owner of the property and that there was no direct evidence that the sheriff's deputies were "occupants" or were delegated the authority by the owner to evict defendant from the property.

¶ 59 In reviewing the sufficiency of the evidence, the question is whether the evidence presented at trial, viewed in the light most favorable to the prosecution, enables any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307, 319 (1979). A guilty verdict can be supported not only by the evidence itself, but also by any reasonable inference to be drawn from the evidence. *People v. Chai*, 2014 IL App (2d) 121234, ¶ 33.

¶ 60        Section 3-6023 of the Counties Code (55 ILCS 5/3-6023 (West 2020)) provides that the sheriff "shall maintain the security of the courthouse." That section further provides that the sheriff's courthouse security function can be carried out by deputy sheriffs. 55 ILCS 5/3-6023 (West 2020). Further, section 3-6023 provides that the sheriff, "in person or by deputy," shall obey the lawful orders and directions of the court. 55 ILCS 5/3-6023 (West 2020). Here, the evidence established that (1) the McLean County sheriff maintained courthouse security, (2) Lane was the sheriff's deputy in charge of courthouse security, (3) the chief judge issued an order limiting who could enter the courthouse due to the pandemic, (4) courthouse security included stationing Hammond and Krone at the entrance to the courthouse to screen persons entering to make sure they complied with the chief judge's order, and (5) Kessinger was a sheriff's deputy who assisted Lane, Hammond, and Krone in maintaining courthouse security and enforcing the chief judge's order. It is also clear that the sheriff's authority extended beyond the building to the plaza where the arrest took place. See *O'Connor v. County of Cook*, 337 Ill. App. 3d 902, 908 (2003) (holding that the sheriff's custodial duties include the courthouse grounds that serve the needs of the courthouse and jail). *O'Connor* cited *County of McDonough v. Thomas*, 84 Ill. App. 408, 412 (1899), for the proposition that a sheriff had common law powers regarding the care and "custody" of a county courthouse.

¶ 61        Defendant argues that *O'Connor* is inapposite because it involved a slip and fall in a parking garage across the street from the criminal courthouse, rather than a violation of the criminal trespass to real property statute. Defendant argues that *O'Connor* has no bearing on

whether the sheriff can evict someone from courthouse premises. We believe it is obvious that by giving the sheriff authority over courthouse "security," the legislature intended to include the authority to evict persons who pose a hazard to the security of the courthouse building and grounds, as well as the welfare of courthouse patrons and employees. Because the sheriff and his or her deputies are designated by statute to maintain custody of the courthouse and its security, we hold that the State's evidence in the instant case proved the elements of criminal trespass to real property beyond a reasonable doubt.

¶ 62                                      III. CONCLUSION

¶ 63            For the reasons stated, we vacate defendant's convictions on counts II and III and otherwise affirm the trial court's judgment.

¶ 64            Affirmed in part and vacated in part.