2024 IL App (1st) 200095-U

No. 1-20-0095

Order filed June 5, 2024

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 16 CR 8715 (01) |
| v. | ) ) | Honorable Thaddeus L. Wilson |
| COREY MORGAN, | ) ) | Judge, Presiding |
| Defendant-Appellant. | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The evidence upon which defendant was convicted was sufficient to convict him under an accountability theory beyond a reasonable doubt and defendant's two additional arguments are forfeited.

¶ 2     Defendant Corey Morgan appeals his conviction and sentence for first-degree murder. Defendant was charged, along with co-defendants Dwright Doty and Kevin Edwards, with first-degree murder for the November 2, 2015 murder of nine-year-old Tyshawn Lee. Defendant was charged under a theory of accountability based on the allegation that Doty

was the one who shot the victim. Edwards pleaded guilty and defendant and Doty proceeded to joint, but severed, trials. Following his jury trial, defendant was found guilty and sentenced to 65 years' imprisonment. On appeal, defendant argues (1) that the State failed to prove facts sufficient to uphold a conviction for first-degree murder on a theory of accountability, (2) that the circuit court erred by failing to properly question the jury during *voir dire*, and (3) that the circuit court erred by considering inappropriate factors during sentencing. We affirm the circuit court's decision and sentence.

¶ 3                                    I. BACKGROUND

¶ 4        On November 2, 2015, nine-year-old Tyshawn Lee was shot to death in an alley adjacent to Dawes Park, near the intersection of S. Damen Avenue and W. 80th Place. The State alleged that Doty was the shooter, but that defendant assisted Doty and was therefore guilty under a theory of accountability.

¶ 5                                      A. Pretrial

¶ 6        During *voir dire*, the circuit court questioned prospective jurors on their understanding and acceptance of relevant tenets of law, including as follows:

> COURT: "Please listen carefully. I need to be able to see you and you need to see me. I need to see everybody is answering. If you disagree with any of the questions, please raise your hand.
>
> * * *
>
> The defendant does not have to present any evidence at all and may rely upon the presumption of innocence. Do each of you understand this principle of law?
>
> Everyone.
>
> Do each of you accept this principle of law?

Everyone.

The defendant does not have to testify at trial. Do each of you understand this principle of law?

Everyone.

Do each of you accept this principle of law?

Everyone.

If the defendant does not testify at trial, would any of you hold that fact against him? Anyone? I need to hear you. If you disagree, raise your hand.

No one."

¶ 7                                    B. Trial Testimony

¶ 8       The State sought and was granted leave to present gang evidence to contextualize their case against defendant. Officer Matthew Kennedy, an expert on the gangs of the southwest side of Chicago, testified that at the time of the shooting, there was an ongoing feud between the Killa Ward (KW) gang, which was a faction of the Gangster Disciples, and the Terror Dome/Bang Bang Gang (TD/BBG), which was a faction of the Black P Stones. On October 13, 2015, Tracey Morgan and his mother were shot. Tracey was a well-known member of TD/BBG and was defendant's brother. Tracey died and his mother was injured. Two members of KW were charged with his murder. Officer Kennedy explained that one of the common rules among gangs in the area was that "violence shouldn't be brought upon innocent victims of family members."

¶ 9       Officer Kennedy expected TD/BBG would retaliate because Morgan's mother's shooting broke that rule. Officer Kennedy requested that the FBI conduct an investigation of the social media posts of both TD/BBG and KW. Among the photos Officer Kennedy received from

this investigation were photos of defendant and his co-defendant Doty displaying the gang sign of TD/BBG. Also among the photos were images of Pierre Stokes, who is the father of the victim, displaying the gang sign of KW alongside two men who were charged with Tracey Morgan's shooting sometime after the victim's shooting.

¶ 10    Multiple witnesses established that the victim, Tyshawn Lee, lived near Dawes Park and that he was in the park just before the shooting. Three men in their twenties, who were notably older than the high-schoolers present in the park that afternoon, were seen in the park. One of the men, who a witness identified as Doty, was described as an African American man no more than six feet tall with a little bit of facial hair, wearing a red and blue striped jacket and Rock Revival brand jeans. Other witnesses, who knew Doty, stated that Doty wore Rock Revival jeans every day. Another of the men, who was identified as defendant, was described as having dreadlocks and wearing a gray Nike outfit. Two witnesses who were at the park just before the shooting identified defendant in photo arrays as one of the three men present. The third man was identified as Edwards by two witnesses as well.

¶ 11    Lashaunda Higgins testified that the three men arrived in a black SUV and walked to a bench, where they sat and talked with one another. When the victim got off the swing he had been occupying, the man that another witness would later identify as Doty stayed in the park while the other two men stood up and returned to the SUV. Doty approached the victim, who had set down a basketball to play on a climbing apparatus. Doty picked up and dribbled the ball while speaking to the victim. Doty then walked out of the park, with the victim, to a nearby alley. Higgins saw the same black SUV that the three men had arrived in stopped at the nearby streetcorner. When Doty and the victim entered the alley, so did the SUV. Higgins

4

heard multiple gunshots from the alley and saw the black SUV drive away from the scene of the shooting. Higgins viewed photo arrays and lineups on multiple occasions, but made no identifications.

¶ 12    Jaylen Anderson spoke with police canvassing the neighborhood the day after the shooting and subsequently identified defendant, Doty, and Edwards in photo arrays. He failed to appear when subpoenaed and testified while in custody. Anderson testified that he was not a gang member at the time of the shooting, but had since become a member of the Gangster Disciples. Anderson testified that he was at Dawes Park at the time of the shooting and saw three men, whom he described in a way that matched Higgins' descriptions. He noted that defendant was carrying a handgun in the front pocket of his gray Nike outfit. After being present in the park for 10-15 minutes, the three men left in a black SUV, but returned and parked in the same spot again shortly thereafter. Defendant and Edwards went to the basketball court and Anderson lost track of Doty's location. Anderson confirmed that there was a playground in the park, but he could not see it from his position near the field house. Around five to seven minutes later, defendant and Edwards returned to the black SUV and drove toward 80th Place. Five to ten minutes later, Anderson heard gunshots from the direction of 80th Place. Anderson left the park after hearing the gunshots.

¶ 13    Other witnesses also identified defendant as present at the park around the time of the victim's shooting. Ariana Cross identified defendant because she recognized his "eyes and dreads." Trinity Richardson identified defendant in a lineup and identified the black SUV in a photograph. Heavyn Taylor did not identify defendant, but did identify Edwards as the driver of the black SUV she saw emerging from the alley where the victim was shot and driving north near the park immediately after she heard gunshots.

¶ 14    Two other witnesses, Devontay Gary and Moesha Walker, were both siblings of co-defendant Edwards and lived with him during a period of time including October and November 2015. Both testified that defendant and his co-defendants were close friends and would frequently be present in the house. Walker further testified that on October 14, 2015, during the conversation with defendant and Edwards in which she learned that Tracey had been killed and his mother shot, defendant said "n***s tweak. Everybody must die, grandmamas, kids, and all," which Walker understood to mean that he intended retaliation. Defendant and Edwards agreed that KW was responsible for the shooting.

¶ 15    Both Gary and Walker testified that Edwards began driving a black SUV a month or so before the shooting and that he ceased driving it shortly after the shooting. The black SUV matched the description of the vehicle seen fleeing the scene of the shooting. Additional testimony established that a black SUV with a license plate matching the SUV driven by Edwards had been missing from the lot of the rental company that owned it during the time Edwards was driving it; that the vehicle was driven from the home of the defendant's girlfriend to the scene of the shooting and was present in the area at the time of the shooting, after which it was driven back to defendant's girlfriend's home; and that the vehicle was abandoned in Dolton, Illinois after the shooting.

¶ 16    Antwan Davis, who lived with defendant's girlfriend at the time of the shooting, testified as to defendant and his co-defendants being present in the home on the morning of the shooting, leaving before lunch, and returning around dusk. Davis described the three as wearing clothes that day that matched other witnesses' descriptions of the individuals in the park. Davis recognized the recovered black SUV as the one that was driven by Edwards during the time Davis was living with defendant's girlfriend.

¶ 17    Collected DNA samples returned results showing mixed DNA, but strongly indicated that Doty contributed to the profile collected from the front driver's door, steering wheel, gear shift, and rear passenger overhead assist handle of the black Ford Edge SUV. The collected samples also strongly and very strongly indicated that he contributed to a sample from the basketball recovered from the site of the shooting. Per the expert witness, Dr. John Buckleton, the DNA evidence collected was one trillion times more likely to have been left behind in a scenario where Doty had contributed his DNA to the sample than in a scenario in which he had not. Defendant was excluded from all of the DNA samples except the one on the overhead assist handle. In that case, the result was inconclusive.

¶ 18    Detective Jeff Rodenberg testified that on November 16, 2015, an anonymous tip prompted him to set up surveillance on the Hilton Hotel in Oak Lawn. Detective Rodenberg observed defendant leaving the hotel with Doty. Defendant was carrying a duffel bag. Defendant and Doty got in a Chrysler and exited the hotel parking lot. Rodenberg and his partner stopped and searched the car. Rodenberg found a loaded handgun in the duffel bag. Defendant and Doty were both taken into custody, but were not yet charged in relation to the victim's killing.

¶ 19    Officer Eulalio Rodriguez testified that on the night of April 21, 2017, he and two other officers came across what appeared to be a music video being recorded in a vacant lot between 71st St. and 70th St. off Wolcott St. The vacant lot had about 30 to 50 people gathered in and around it, who scattered upon seeing the unmarked police SUV that Officer Rodriguez was driving. Officer Hyma, who was also in the car, got out and Officer Rodriguez lost track of her as he made a three-point turn to go back down the alley in which

he was driving. After looping around to the Wolcott St. side of the lot, Officer Rodriguez found Officer Hyma with two individuals whom she had stopped.

¶ 20    Officer Rodriguez searched the vacant lot with other officers and they located five firearms throughout the lot. Officer Hyma found a black semiautomatic pistol with a serial number matching a Smith & Wesson .40 caliber handgun which, according to testimony from an ATF agent, was purchased by an out of state buyer and mailed to Anthony Morgan. Detective Murphy testified that he authored a report about the recovery of this firearm and the match between the weapon and the casings found near victim's body. The serial number on the firearm recovered from the duffel bag defendant had on his person when he was stopped by Detective Rodenberg and arrested identified it as another of the weapons sold to Anthony Morgan by the same buyer.

¶ 21    After deliberation, the jury found defendant guilty of first-degree murder, that it was proven that during the commission of the murder, defendant, or an individual for whose conduct he was legally accountable, was armed with a firearm at the time of the offense, and that the victim was under 12 years of age.

¶ 22                                C. Sentencing

¶ 23    The circuit court prefaced its sentencing for defendant and Doty with a lengthy soliloquy:

> "The tragic loss of a good friend and brother and the galling injury to your mother is painful to say the least, but vengeance is not yours, nor will the law tolerate retaliation and vigilante justice.
>
> Like sands through the hourglass, the days of our lives are like a speck of dust slipping away in front of us, falling through the fingers of [F]ather [T]ime. The sands of life run through the hourglass without stopping, letting us know that our end is

near. Unlike a clock with its endless sweeping cycles, the hourglass of life has a definite end, and we can ill afford to allow lawless and brazen shootings, murders and back and forth retaliation to needlessly snuff out a life before our created time to shuffle off this mortal coil.

We have gun-toting adults and children indiscriminately shooting and taking out innocent lives in the process. Many couldn't shoot the side of a barn from two feet away, yet they have a gun. We see individuals in the name of a gang taking up roles in furtherance of criminal activity, and no matter their role, they are responsible."

¶ 24    The circuit court spoke at some length about the theory of accountability, under which defendant was charged, and the breadth of roles an individual might play and find themselves accountable for a murder, even if that murder was unplanned. The circuit court then stated:

"During pretrial proceedings I received a large binder detailing shootings and murders between various gang members and factions in this area of the city. The ruthless cycle of gang shootings and murders, the tit for tat retaliations covered a period from May of 2012 through October of 2015 with the murder of Briana Jenkins and the November 2015 murder of Tyshawn Lee and the March 2016 shooting of Robin Matthews. It was a disheartening and terrifying reading to say the least.

Our communities have turned into virtual war zones with indiscriminate shootings and senseless retaliations. Innocent citizens are caught in the crossfire. People can't freely walk around and enjoy their neighborhood or play in the park. School kids need safe passage workers to line the streets just to get home from school. Now people shut themselves in their homes to avoid the violence outside yet still fall victim to bullets intended for someone on the street flying through the walls of their

9

homes. Our communities are not fair game in the spoils and pillaging and vicissitudes of gang war.

We constantly hear that someone going about their business, trying to do good, excel in school, or just make a better life for themselves and their families are struck down by untargeted violence. Invariably someone says they were in the wrong place at the wrong time.

No. They were in the right place at the right time, down the right path of life doing the things they rightly should be doing. They were not in the wrong place and the wrong time, and if we let that saying continue to prevail, there will be no place left to retreat.

Already, you can't retreat into the safety of your home. You can't leave the neighborhood and retreat to downtown. You can't retreat from downtown to the suburbs. Now we all have to deal with it.

Where does this stop? Where does this mind-numbing, debilitating, senseless violence stop? It stops with grandmas, mamas and innocent children simply trying to play at a park. Grandmas, mamas, kids all matter. They all matter. Grandmas, mamas, kids and all are not fair game, and they matter to us. Whether they have been in this world only eight seconds, eight minutes, or eighty years, they matter.

With respect to both defendants, for purposes of sentencing, the Court has considered the evidence at trial, the gravity of the offense, the Presentence Investigation Report, the financial impact of incarceration, all evidence, information and testimony in aggravation and mitigation, any substance abuse issues and treatment, the potential for rehabilitation, the possibility of sentencing alternatives,

and with respect to Mr. Doty, the fact that he was under the age of 25 at the time of the offense, the victim impact panel statements and all hearsay presented and deemed relevant and reliable."

¶ 25    The circuit court sentenced defendant to 65 years in the Illinois Department of Corrections, plus three years of mandatory supervised release. Defendant filed a timely notice of appeal and this appeal follows.

¶ 26                                    II. ANALYSIS

¶ 27    Defendant makes three arguments on appeal. First, defendant argues that the evidence presented by the State was insufficient to support his conviction for first-degree murder under a theory of accountability. Second, defendant argues that the circuit court erred in the process of questioning the jurors as to their understanding of the principles of law governing their role as jurors and thereby failed to meet the requirements of Rule 431(b). Third, defendant argues that the circuit court erred by considering unrelated crimes when sentencing him.

¶ 28                          A. Sufficiency of the Evidence

¶ 29    Defendant argues that the evidence presented by the State was insufficient to establish his guilt under an accountability theory. Specifically, defendant asserts that the State failed to show that defendant possessed the requisite intent or that he shared a common criminal design with the shooter.

¶ 30    "In reviewing a sufficiency of the evidence claim, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. De Filippo*,

11

235 Ill. 2d 377, 384-85 (2009). "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Newton*, 2018 IL 122958, ¶ 24. "In weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hardman*, 2017 IL 121453, ¶ 37.

¶ 31 "When considering a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). "The testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *Id*. "A reviewing court will not reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness was not credible." *Id*. A reviewing court "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id*. (quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992)).

¶ 32 To convict defendant of first-degree murder under an accountability theory, the State was required to prove the essential elements of the crime beyond a reasonable doubt. In this case, defendant does not contest that the relevant murder was proven, only that the requisite elements to demonstrate his accountability for that murder were proven. To establish defendant's accountability, the State was required to show either (1) that defendant, either before or during the offense, and with the intent to promote or facilitate the offense, solicited, aided, abetted, agreed to aid or attempted to aid Doty in killing Lee, or else that (2) defendant engaged in a common criminal design or agreement with Doty to kill Lee. 720 ILCS 5/5-2(c)

(West 2014). "Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." *Id.* "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2014).

¶ 33    "Under the common-design rule, if two or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." (Internal quotation marks omitted.) *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Id.*

¶ 34    In this case, the necessary elements of the crime were sufficiently established by the testimony at trial. Defendant devotes considerable attention to assertions that the evidence presented against him could be interpreted in other ways and does not necessarily oblige an observer to arrive at the conclusion that he was guilty. Defendant is correct in these assertions, but they are irrelevant to our standard of review. We are to draw all inferences in favor of the prosecution and ask, when viewing the evidence in that light, whether any reasonable trier of fact could have found the requisite elements to have been proven beyond a reasonable doubt. *De Filippo*, 235 Ill. 2d at 384-85. Although the specific wording of Moesha Walker's testimony may have changed between her statements to police, her

testimony before the grand jury, and her testimony at trial, the essential elements necessary to infer an intent to engage in a revenge killing were present throughout; specific mention of killing a child is unnecessary to maintain such an inference. It is not our role to second-guess the credibility determinations of the trier of fact unless they are "so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Siguenza-Brito*, 235 Ill. 2d at 228. Here, the variances in Walker's testimony do not rise to such a level.

¶ 35    Defendant argues that this case is similar to *People v. Taylor*, 186 Ill. 2d 439 (1999). We disagree. In that case, the defendant was charged with aggravated discharge of a firearm under a theory of accountability. *Id*. at 444. The defendant had been driving a vehicle with a friend in the passenger seat when the friend became angry with the occupants of another vehicle and told defendant to stop the car. *Id* at 443. Defendant did so and the friend exited the vehicle, exchanged words with the occupants of the other vehicle, produced a gun, and fired two shots in the air in the general direction of the other vehicle. *Id*. Defendant was aware that his friend had a gun in his possession when he stopped the car. *Id*. Defendant's friend reentered the vehicle and defendant drove them away from the scene of the offense. *Id*. Our supreme court reversed the defendant's conviction because he had not aided or abetted the offender in the commission of the offense. *Id*. at 448. The court relied heavily on a previous decision in which it determined that assisting an offender in leaving the scene of a crime was insufficient to hold a defendant accountable for the crime where the defendant was not aware of the offender's intent to commit the crime. *Id* at 446-49. (citing *People v. Dennis*, 181 Ill. 2d 87 (1998) (in which our supreme court determined that a getaway driver who had no knowledge of the planned crime before it occurred was not accountable for the offense)).

14

¶ 36    Taking the testimony of the witnesses who were in Dawes Park just prior to the shooting in the light most favorable to the State, it was established that defendant arrived at Dawes Park with Doty, spoke with Doty on a bench in the park, spent time in the park immediately prior to the shooting, then went back to the vehicle and was inside it as it waited near the site of the shooting and as it fled the scene of the shooting with Doty on board immediately following Lee's killing. One could reasonably infer from these facts that defendant was assisting Doty in a plan to kill Lee. This conclusion is not precluded by *Taylor* or *Dennis*, as even if one were to infer that defendant's only role was to aid Doty in his escape, the witness testimony supported a reasonable inference that defendant and Edwards' movements and positioning of the vehicle prior to the shooting indicated an awareness that the shooting was going to occur.

¶ 37    It is not our role to instruct the trier of fact on which inferences to make, only to determine whether they could reasonably be made. One could reasonably infer from these facts that defendant was helping to locate Lee, to determine the best course of action in killing Lee, and to escape the scene of the crime. This evidence, in combination with Walker's testimony, was sufficient to support both a finding that defendant intentionally aided Doty in killing Lee and that defendant engaged in a common criminal design with Doty to kill Lee. Accordingly, defendant's sufficiency of the evidence claim fails, and we must affirm defendant's conviction.

¶ 38                          B. Rule 431(b) Compliance

¶ 39    Defendant argues that he was deprived of his right to a fair and impartial jury because the circuit court failed to comply with Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)) during *voir dire*, when questioning jurors on their acceptance and understanding of the fact

that defendant did not have to testify on his own behalf and that, if he chose to refrain from testifying, that choice was not to be held against him.

¶ 40        Rule 431(b) states:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." *Id.*

¶ 41        Defendant acknowledges that this alleged error was not preserved at trial and asks that we review the error as plain error. "To preserve a claim of error for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). However, a "narrow and limited exception" exists where an appellant can demonstrate plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step of establishing plain error is to "show that a clear or obvious error occurred." *Id.*

¶ 42        There is no question that the circuit court failed to comply with Rule 431 and therefore erred. Our supreme court's opinion in *People v. Belknap*, 2014 IL 117094, is instructive in this matter and factually similar to this case. In *Belknap*, after presenting each principle of law to the jury, the circuit court inquired of the jurors: "Is there anyone who doesn't agree with this principle?" *Id.* ¶ 42. Where the circuit court varied from this exact wording, it was

only to a small degree. *Id*. Our supreme court found: "As we noted in *Wilmington*, it may be arguable that asking jurors whether they disagreed with the Rule 431(b) principles is tantamount to asking them whether they accepted those principles. However, the trial court's failure to ask whether the jurors understood the principles constitutes error alone." *Id*. ¶ 46 (citing *People v. Wilmington*, 2013 IL 112938, ¶ 32).

¶ 43        Our supreme court has further held that Rule 431(b) "mandates a specific question and response process." *Thompson*, 238 Ill. 2d at 607. "The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule." *Id*. "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id*. As this is a matter of law, our review is *de novo*. *Belknap*, 2014 IL 117094, ¶ 41.

¶ 44        In this case, the circuit court erred in questioning the jury regarding the fourth principle listed in Rule 431, "that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431 (eff. July 1, 2012). The circuit court's questioning leading up to and regarding that principle consisted of the following:

> "[COURT:] The defendant does not have to testify at trial. Do each of you understand this principle of law?
>
> Everyone.
>
> Do each of you accept this principle of law?
>
> Everyone.
>
> If the defendant does not testify at trial, would any of you hold that fact against him? Anyone? I need to hear you. If you disagree, raise your hand.

17

No one."

¶ 45    Just as in *Belknap*, even if we accept that the circuit court's question regarding disagreement with the principle is equivalent to a question as to whether the jurors accepted the principle, there is no reasonable argument that the circuit court questioned the jurors as to their understanding of the principle. The State cites appellate cases that have asserted that a strict question-and-answer format is not necessary. *People v. Lilly*, 2018 IL App (3d) 150855, *People v. Walker*, 2021 IL App (4th) 190073. However, the issue here is not whether the question-and-answer format was adequate, but whether one of the necessary questions was asked at all. In *Lilly*, the circuit court did not ask each question individually, but rather listed multiple principles after beginning the question with: "Do you understand and accept the following?" *Lilly*, 2018 IL App (3d) 150855, ¶ 4. Thus, in *Lilly*, the question was asked, merely in a less back-and-forth format. Similarly, in *Walker*, the court began: "The question that I am asking you is, 'Do you understand and accept these principles of law,' and then I'm gonna read you the principles of law and ask you individually if you understand and accept these principles of law." *Walker*, 2021 IL App (4th) 190073, ¶ 55. Again, in *Walker*, the question was asked, but in a different form. Here, the question was not asked in any form, therefore the circuit court erred. We note that following closing argument, the circuit court admonished the jury that "[t]he fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict." While this admonishment may have been sufficient to remedy any confusion instilled in the jury by the initial error, the court nonetheless erred.

¶ 46    The second prong of the plain error doctrine allows for review of unpreserved errors in two scenarios:

"[W]hen (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 47 Defendant explicitly disclaims any argument regarding the second prong and focuses his argument on the first. To satisfy the first prong, defendant must "show that the error was prejudicial—in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Id.* at 566 (citing *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). "[A] reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine." *Belknap*, 2014 IL 117094, ¶ 50. "Where a case does not involve competing witnesses and the jurors are not asked to determine 'relative credibility,' the factfinder's responsibility to assess witness credibility does not automatically make the evidence closely balanced." *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51 (citing *People v. Hammonds*, 409 Ill. App. 3d 838, 861-62 (2011)).

¶ 48 Defendant asserts that "[a] case is closely balanced when 'it can hardly be said that reasonable jurors could only draw from the evidence a conclusion of guilt,' " with citation to *People v. Nelson*, 193 Ill. 2d 216, 223 (2000). This is an inaccurate reading of *Nelson*. In *Nelson*, our supreme court did use that language in the process of articulating its conclusion that the evidence was "very closely balanced," but it is abundantly clear in context that the language was in no way a definition of what it means for the evidence to be closely balanced.

19

*Id*. As aforementioned, our task is to undertake a "commonsense analysis." *Belknap*, 2014 IL 117094, ¶ 50.

¶ 49    We find that the evidence was not closely balanced in this case. Multiple unconnected witnesses placed defendant at the park and subsequently identified him in lineups or photo arrays. Multiple witnesses attested that the vehicle in which he was seen arriving at the park, which lingered near the scene of the shooting prior to the shooting, and in which it would be reasonable to conclude Doty escaped after the shooting, was driven by co-defendant Edwards around the time of the shooting, with one witness identifying Edwards as the person driving the vehicle as it sped away from the scene of the crime. Navigation data showed the vehicle traveling from the home of Robin Mathews, who was defendant's girlfriend at the time and who was also known as Millie, to Dawes Park before the shooting and returning from Dawes Park to Millie's home after the shooting. Defendant and his co-defendants' movements in and around the park prior to the shooting could very reasonably be interpreted as coordination of efforts around a planned offense. Co-defendant Edwards' sister testified that in the wake of the shooting death of defendant's brother, defendant said to Edwards: "n***s tweak. Everybody must die, grandmamas, kids, and all." The shooting death of defendant's brother was within the context of a larger conflict between his gang and the gang to which allegiance was owed by those who were ultimately arrested for defendant's brother's murder. Further, the gun used to kill Lee was purchased by defendant's brother from the same seller who sold that brother the gun that was in defendant's possession at the time of his arrest.

¶ 50    There was no evidence presented that suggested a viable alternative shooter or that gave an alternative explanation for defendant's presence in the park. As there were no opposing witnesses presenting an alternative course of events or explanation, there was no contest of

credibility. Defendant's case was based solely in pointing out weaknesses and deficiencies in the State's case. Although the evidence presented did not mandate a finding of guilt, we cannot say the evidence was close in this case. Accordingly, defendant's argument regarding the circuit court's failure to abide by Rule 431(b) is forfeited.

¶ 51                                  C. Sentencing

¶ 52        Defendant argues that the circuit court abused its discretion by rendering defendant's sentence "after commenting at length about the history of violence in Chicago" where those comments, "in large part, concerned unrelated crimes and unintended victims of gang violence or those hit by stray bullets" and where the circuit court "relied on documentation presented by the State in its motion to admit gang evidence that included details of numerous crimes starting in 2012 and ending in 2016" that were attributed to the conflict between TD/BBG and KW. Defendant again acknowledges that this alleged error was not preserved at trial and asks that we review the error as plain error.

¶ 53        "It has long been established that the trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive." *People v. Jones*, 168 Ill. 2d 367, 373 (1995). "Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed." *Id*. at 373-74. "In rendering a sentence, a trial judge is presumed to have relied upon only competent and reliable evidence. Additionally, it is defendant's burden to overcome this presumption." *People v. Griffith*, 158 Ill. 2d 476, 497 (1994).

¶ 54 Defendant cites to *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001), in which our supreme court opined: "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." The judge in *Dameron* "spoke at length about social science statistics and vague generalizations about crime he uncovered through his own investigation" and "[a]n excerpt from the *** book recited by the judge also conflict[ed] with evidence in the case." *Id.* at 176. There is no evidence that the circuit court conducted any such private investigation in the case at bar, so *Dameron* is factually inapposite.

¶ 55 Defendant's additional citations in support of the proposition that a judge cannot consider private knowledge similarly present scenarios that are inapplicable to this case. In *People v. Rivers*, 410 Ill. 410, 415-16 (1951), the court similarly generally decried violence in the area before rendering its sentence. However, the *Rivers* court stated that "[t]he courts must put an end to these vicious killings by imposing suitable punishment upon these youngsters for their crimes" and cited statistics, which were not in the record, about the number of unregistered guns in the city. *Id.* at 415-18. In the case at bar, the record does not reflect that the circuit court relied on any such private knowledge in rendering its decision. Though the case at bar did not concern a stray bullet or the larger issue of fear of gang violence, the circuit court's commentary made use of nothing more than evidence in the record and general knowledge of which any resident of Chicago would be aware. Additionally, it is permissible to comment on the problems caused by the sort of crime committed by the defendant in order help the defendant "understand why they are subject to the penalties provided by law and why they

have received their particular sentences." *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993).

¶ 56    Although the circuit court did mention the so-called "large binder detailing shootings and murders between various gang members and factions," it did not state that its sentence was in any way based on those crimes. In fact none of the language referred to by defendant was framed by the circuit court as the reasoning behind its sentence, but rather appears to have been a soliloquy designed to make a statement about a larger issue, especially considering that the case garnered significant press attention and was, as one attorney called it on the record, "the most sensational murder trial that this county [had] seen in 10 years." The circuit court concluded its soliloquy by asking where this larger issue of gang violence stops and by referring to the specific language from the case at bar in his answer: "It stops with grandmas, mamas and innocent children simply trying to play at a park." By laying out the larger issue of gang violence and then making reference to the particular language in this case, the circuit court emphasized the particular depravity of the intentional killing of a 9-year-old child, which was explicitly a relevant factor in the possibility of delivering an extended-term sentence. 730 ILCS 5/5-5-3.2(b)(3)(i) (West 2018) (allowing courts to impose an extended-term sentence where a felony is committed against a person under 12 years of age).

¶ 57    Immediately after the circuit court's soliloquy, it stated the factors that it considered, which included the relevant and required statutory considerations, 730 ILCS 5/5-4-1(a) (West 2018), with the addition only of "the seriousness of the offense," which our supreme court has noted as a relevant factor to be weighed. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). "Personal comments or observations are generally of no consequence where the record shows the court otherwise considered proper sentencing factors." (Internal quotation marks

omitted.) *People v. Walker*, 2012 IL App (1st) 083655, ¶ 33. The sentence defendant received was below the midpoint of the applicable sentence range when the possibility of an extended sentence is considered, which, as aforementioned, was justified by the age of the victim alone. Under Section 5-4.5-20(a) of the Unified Code of Corrections, a sentence for first degree murder is to be not less than 20 years and not more than 60 years, but an extended sentence is to be not less than 60 years and not more than 100 years. 730 ILCS 5/5-4.5-20(a) (West 2018). Under Section 5/5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections, where, as here, it is found that "if the person [or the person for whose conduct the defendant is legally responsible] committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018). Accordingly, the permissible range was 35-115 years.

¶ 58    Even where a court may rely on an improper aggravating factor in sentencing, "where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327 (1983). Defendant's sentence was not within the range applicable to an extended sentence with a firearm enhancement, despite the age of the victim, but was instead near the top of the 35-75 year range for a standard sentence with the firearm enhancement. There is no indication in the record that the decision to impose this sentence was the result of a general distaste for gang violence rather than the fact that the victim was a 9-year-old child. The circuit court's focus on "grandmas, mamas, and innocent children" indicates the importance the circuit court was placing on the age of the victim. In that context, even if we accept that an improper factor was considered, we cannot say that a sentence of 65 years was significantly affected by such consideration where the sentencing

24

range available to the court was 35-115 years. Accordingly, because we find no clear or obvious error to support a claim of plain error, we need proceed no further in the plain error analysis, and we find that the issue is forfeited on appeal. We affirm the sentence of the circuit court.

¶ 59                                    III. CONCLUSION

¶ 60        For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 61        Affirmed.